555 F.2d 1002
 14 Fair Empl.Prac.Cas. 1077,
13 Empl. Prac. Dec. P 11,615, 181 U.S.App.D.C. 65,
2 Media L. Rep. 1609
 NATIONAL ORGANIZATION FOR WOMEN, NEW YORK CITY CHAPTER et
al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents,
American Broadcasting Companies, Inc., Intervenor.
NATIONAL ORGANIZATION FOR WOMEN et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
National Broadcasting Companies, Inc., Intervenor.
 Nos. 74-1853, 75-1711.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 28 Oct. 1976.
Decided 11 April 1977.
 Rhonda Copelon, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court with whom Nancy Stearns, Nancy E. Stanley, New York City, and Gladys Kessler, Washington, D. C., were on the brief for petitioners.
 Mary-Helen Mautner, Atty., Equal Employment Opportunity Commission, Washington, D. C., with whom Beatrice Rosenberg, Charles L. Reischel and Lutz Alexander Prager, Attys., Equal Employment Opportunity Commission, Washington, D. C., were on the brief for Equal Employment Opportunity Commission as amicus curiae.
 J. Tullos Wells, Counsel, F. C. C., Washington, D. C., for respondents. Ashton R. Hardy, Gen. Counsel, F. C. C., Daniel M. Armstrong, Associate Gen. Counsel and Sheldon M. Guttman, Counsel, F. C. C., Washington, D. C., were on the brief for respondents. Joseph A. Marino, Associate Gen. Counsel, F. C. C., Washington, D. C., at the time the record was filed also entered an appearance for respondent, F. C. C.
 Robert W. Coll, Washington, D. C., with whom James A. McKenna, Jr., and Arthur B. Goodkild, Washington, D. C., was on the brief for intervenor.
 Before LEVENTHAL, ROBINSON and WILKEY, Circuit Judges.
 Opinion for the Court filed by WILKEY, Circuit Judge.
 WILKEY, Circuit Judge:
 
 
 1
 Appellants in these two cases filed petitions to deny the license renewal applications of WABC-TV and WRC-TV. The Commission denied these petitions without a hearing and renewed the applications. On appeal the appellants seek a hearing from the Commission in order to contest the adequacy of the licensees' ascertainment efforts, programming performance, and employment practices. The issue for decision is whether the Commission could reasonably find that the appellants had not raised substantial and material questions of fact which would show prima facie that the Commission's renewal of the two licenses would not serve the public interest. For the reasons set forth herein, we affirm.
 
 I. BACKGROUND
 
 2
 In March 1972 WABC-TV (hereinafter referred to as ABC) applied for renewal of its license in New York City. On 1 May 1972 the National Organization for Women, New York Chapter (hereinafter referred to as NOW) filed a petition to deny pursuant to Section 309(d) of the Communications Act of 1934, as amended.[1] After unsuccessful negotiations with NOW, ABC filed its opposition to the petition in January 1973.
 
 
 3
 In July 1972 WRC-TV (hereinafter referred to as WRC) applied for renewal of its license in Washington, D.C. The National Organization for Women, National Capital Chapter, along with other women's rights organizations in the metropolitan area (hereinafter jointly referred to as NOW) filed its petition to deny on 31 August 1972. Various responsive and supplemental pleadings were later submitted by both sides.
 
 
 4
 In the fall of 1974 NOW brought an appeal in this court for an order directing the FCC to rule on its petitions, alleging that the failure of the FCC to rule after that period amounted to a denial of their petitions. On 22 January 1975, prior to full briefing by the parties, a motions panel of this court, acting in response to appellants' motion for leave to file a brief in excess of the page limit and appellee's motion to compel adherence to Rule 21 of the Federal Rules of Appellate Procedure, ordered the Commission to rule on the petitions within sixty days or to state its reasons for further deferring action. On 19 March 1975 the Commission denied the petitions and on 2 April 1975 issued its memorandum opinions and orders.[2] NOW appeals from those orders.[3]
 
 
 5
 In this appeal, severed into two cases by court order, American Broadcasting Companies, Inc., intervenes on behalf of WABC-TV and National Broadcasting Company, Inc., on behalf of WRC-TV. Subsequent to the appeal the Commission obtained a temporary remand from this court to consider matters raised by the Equal Employment Opportunity Commission (EEOC) concerning WRC's employment practices. On 18 February 1976 the Commission issued a supplemental opinion reaffirming the grant of WRC's 1972 renewal.[4] As amicus in both these cases, the EEOC has supported NOW's request for a hearing on employment practices.
 
 
 6
 The first question on appeal here involves whether ABC properly conducted its ascertainment effort with respect to the interests and problems of women. The second area of inquiry concerns two of the related responsibilities of the licensee: whether ABC's past programming was responsive to the needs and interests of women and whether ABC and WRC violated the fairness doctrine in their presentation of conflicting viewpoints on the role of women in society. And, thirdly, this appeal must examine whether the employment practices of ABC and WRC in connection with the hiring of women have been in compliance with the equal employment opportunity policy developed by the FCC.
 
 
 7
 Our review at this junction is focused on whether the Commission properly denied a hearing on these questions. In order for a petition to deny to require a hearing it must "contain specific allegations of fact sufficient to show . . . that a grant of the application would be prima facie inconsistent with (the public interest.)"[5] If the Commission finds that such a showing has not been made, it may refuse a petition on the basis of a concise statement of its reasons. Upon our review of those reasons, if it appears that "the Commission's action was not arbitrary, capricious or unreasonable, we must affirm." Columbus Broadcasting Coalition v. FCC.[6]
 
 II. ASCERTAINMENT EFFORTS
 
 8
 In order for a licensee to operate better its station in the public interest, the Commission requires it to familiarize itself with the needs, interests, and problems of the groups comprising the area it serves. Along with its 1972 renewal application, ABC filed a report on the efforts it had made to ascertain the felt concerns of the New York City area. The ABC ascertainment effort had been based upon the latest question and answer guidelines set out in the 1971 Primer on Ascertainment of Community Problems by Broadcast Applicants.[7] Its relevant provisions require the licensee first to determine the composition of the service area in order "to inform the applicant and the Commission what groups comprise the community."[8] Then the licensee must consult representatives of those groups in order to identify the community problems and needs, evaluate the problems and needs revealed, and prepare responsive programs and announcements. The Primer expressly provides that a compositional study may be challenged as inadequate if it fails to identify a "significant" group. Whether a group is "significant," the Primer instructs, "may rest on several criteria, including its size, its influence, or its lack of influence in the community."[9]
 
 
 9
 In this case, the ABC compositional study failed to identify women as a "significant group" in the community. The Commission essentially agreed with NOW that the omission was mistaken but concluded, in effect, that it constituted "harmless error." It said:
 
 
 10
 In spite of the fact that ABC's compositional study falls short of the obligation the Commission imposes, we do not view this shortcoming as either substantial or material in light of the fact that ABC interviewed a substantial number of women community leaders, including leaders of women's groups.[10]
 
 
 11
 In support of its view that women's groups were consulted despite the omission, the Commission heavily relies upon what it views as "NOW's concession that the licensee did, in fact, contact five women who were involved in women's issues."[11] NOW counters that ABC's initial error of omission was, indeed, materially consequential, because it meant, first, that the five women noted were not consulted from the standpoint of leadership in the women's rights movement, and second, that the number of such representatives, five out of a total of 233 leaders consulted, was too few for an adequate ascertainment of women's needs and interests.
 
 
 12
 Before proceeding to the merits of this controversy, the court is pleased to note that the FCC has sought to reduce the ambiguity about which leaders should be consulted by specifically identifying some nineteen community interests. Among them, the new Primer on Ascertainment of Community Problems by Broadcast Renewal Applicants lists "Organizations of and for Women"[12] as being a significant group commonly found in a community. Hopefully, then, our discussion of this ascertainment problem will be largely of historical interest only, at least as applied to women as a group.
 
 
 13
 The 1971 Primer states that the purpose of consulting with a community leader "is to ascertain what the person consulted believes to be the problems of the community from the standpoint of a leader of the particular group or organization."[13] Exemplifying this "perspective" policy of the Commission is its decision in Cosmos Broadcasting Corp.,[14] which rejected the station's argument that the black community had been ascertained because the black interviewed was "interviewed in his capacity as a farm agent and not in any way as a spokesman for the Negroes of his community." The reason why it is so important for the compositional study to identify the significant groups is not only so that the station can consciously and deliberately seek out community leaders but also so that the leaders interviewed will be consulted from the perspective of the groups they represent. Hence ABC's failure to identify women as a significant group at the outset gives us reason for added scrutiny of the Commission finding of "harmless error."[15]
 
 
 14
 As noted, the Commission found that the women's movement had been ascertained because ABC interviewed "five women who were involved in women's issues."[16] While there may be no doubt that the organizations listed below are "involved" in women's issues, the record in this case raises real doubts for us whether the women here were interviewed from the perspective of leadership in the women's movement. In its memorandum the Commission pointed out that ABC listed the leader's organization on each interview sheet and assumed that ABC interviewed the leader from the perspective of the group listed.
 
 
 15
 Such a disposition of NOW's "perspective" objection, however, appears to us to open an inquiry, not to close one. One of the five leaders interviewed, for example, was Eleanor Holmes Norton, listed by ABC on its ascertainment report solely as "Chairman, New York City Commission on Human Relations."[17] Nowhere in the report or in the affidavit of the interviewer[18] does it appear that she was interviewed from the standpoint of a leader of the women's movement. Similarly, Irma Zigas, also one of the five leaders, was listed as "Chairman, Women Strike for Peace Anti-Draft Clearing House"[19] with no further indication of "perspective" from the interviewer's affidavit.[20] It may well have been, from all the record contains, that Norton was interviewed from the perspective of a champion of anti-discrimination generally and Zigas, as an anti-war activist. Furthermore, the evidence in the record about what was said in the interviews adds to our concern about "perspective". Norton, for instance, said that she told the interviewer that the "major challenge now facing the media" was its insensitivity to the needs of women as a group.[21] This concern was not recorded on the interview sheet because the interviewer "did not understand her to be designating this as a community problem of local, statewide or national importance."[22] Even if the interviewer properly left the problem of the media itself off the interview sheet, as the Commission held,[23] the exchange still raises questions. ABC's own interview guidelines instruct an interviewer to ask the leader for problems "confronting your community" and to "go deeper to find out" the causes behind problems.[24] If the interviewer was questioning her from the perspective of a leader in the women's movement, perhaps he would ordinarily have asked about her views on the underlying causes of her perceived media indifference.
 
 
 16
 An exchange that puts the question of "perspective" into dramatic focus involves Lurana Spanier, listed as "Director of the Vocational Center for Women Nassau County."[25] Her affidavit recites that she discussed a number of women's issues outside of the media and even gave the interviewer a newspaper article about job stereotypes.[26] The interviewer, however, could "not recall" that she named equal rights for women as an issue of great importance.[27] If the interviewer was approaching her as a leader of the women's movement, as her title in this one instance would readily suggest, the two very varied recollections of the same interview presents, at best, a puzzle. In our view, then, material questions of fact have been presented to the Commission about whether the ABC survey of community leaders did adequately interview leaders of the women's movement from that perspective.
 
 
 17
 Before the Commission must accord a hearing, however, a petitioning party under Section 309(d)(2) must raise substantial as well as material questions of fact. Whether material questions of fact, such as have been found here, amount in the aggregate to a substantial question as to the adequacy of the ascertainment effort may in some circumstances be a decision best left for the Commission on a remand. And, indeed, in this situation, there are competing considerations with respect to the grant of a hearing that may more aptly be weighed in the first instance by the Commission than by this court. On the one hand are the other ABC efforts at ascertainment through random surveys, community affairs luncheons and other special studies that the Commission might determine could compensate for the errors in the survey of community leaders. For the Commission has already stated that "ABC has done much more than the Primer requires."[28] On the other hand, however, is the "contact" function served by community leader interviews which may not readily be replaced. The Primer states that personal interviews are important in order to "establish a contact with the station" so that "a community leader knows someone to call" for further dialogue or discussion.[29] And relevant overall may be the Commission's judgment on the "good faith" of ABC in its failure to identify women as a "significant" group.[30] In short, under ordinary circumstances this court would seriously consider a remand to the Commission for a fresh determination of the "substantiality" of questions for an evidentiary hearing.[31]
 
 
 18
 In this case, however, we believe that a remand is not warranted. It is important to remember that the ascertainment effort is "prospective in orientation; it is directed at proposals for future programming, not past programming." Stone v. FCC.[32] One of the primary rationales for an inquiry into a past deficiency is to discover if there is some faulty ascertainment, like the lack of communication with a significant group, that would affect future programming. And one of the primary advantages of identifying past mistakes in ascertainment is to assure that future efforts correct and compensate for the errors.
 
 
 19
 With these goals of a hearing in mind, we direct our attention again to the new Primer on ascertainment[33] that the FCC has issued. It requires, as noted, that the licensee consult with leaders from "Organizations of and for Women." This express requirement, which we have no reason to believe the licensees will not follow, should go a long way towards preventing a repetition of the original mistake in this ascertainment, namely, the nonidentification of women as a "significant" group. The new Primer also specifies that a licensee should consult with leaders "on a continuous basis,"[34] not just during a period prior to renewal. This new feature presumably means that ABC is already in the process of seeking out and interviewing the leaders of women's groups. If ABC is conscientiously serving this obligation, then its future programming should be taking into account, as the ascertainment process envisions, the needs, interests, and problems of women which are reported in the interviews.
 
 
 20
 While we do not remand here because the Commission has faced and dealt with the problem at issue with its newer and more specific standards, which ABC is presumably engaged in applying, yet, because the past ABC ascertainment has had its failings with respect to the women's movement, it is our view that ABC is under an extra obligation in the current, continuous ascertainment. It should make a particular effort to seek out more than the minimum satisfactory number and range of leaders of the women's movement[35] and the Commission should carefully scrutinize the next renewal application of ABC for this compensating effort.
 
 III. PROGRAMMING
 
 21
 In seeking to assure that a license renewal will be issued in the public interest, the Commission measures the programming of the licensee against its "obligation to meet the needs and interests of its entire area of service."[36] In addition, as stated in its opinion here, the Commission reviews the licensee's programming to see if it complies with the obligation of the fairness doctrine that "if a station presents a discussion of one side of a controversial issue of public importance, it must afford reasonable opportunity in its overall programming for the presentation of contrasting views."[37] NOW challenges as inadequate the performance of ABC and WRC in meeting these related responsibilities of responsive programming and of the fairness doctrine. On appeal, NOW seeks a hearing on ABC's performance with respect to responsive programming and on the performances of both ABC and WRC with respect to the fairness doctrine.
 
 A. Responsive Programming
 
 22
 As noted, each licensee is obligated to present programming that is responsive to the needs and interests of its service area. However, "(h)ow a broadcast licensee responds to what may be conflicting and competing needs . . . remains largely within its discretion."[38] In this case the Commission found no abuse of discretion by ABC and held that a hearing would be unwarranted. Adopting, apparently arguendo, the NOW definition of "women's issues" for this inquiry, the Commission specifically denominated programs ABC presented during its past term, 1969-1972, that met the problems, needs and interests of women.[39] In light of these presentations the Commission found "no merit" to NOW's contention that ABC did not respond to the needs of women in its programming. The Commission also answered and rejected various NOW charges about the sufficiency, the characterization and the placement of the responsive programming.
 
 
 23
 1. The factual basis for the NOW charges, which will now be explored, was primarily a monitoring study it conducted for two weeks in 1971 and "randomly" for two months in 1972. With respect to news reporting, for example, NOW contends that coverage of women's issues was insufficient and minimal. On the day the Equal Rights Amendment passed both Houses of Congress, NOW reports that ABC devoted only 10 seconds to the announcement on the seven p. m. news while doing a 60-second story two days later on women who oppose the ERA. NOW also points to ABC coverage of women's sports news: it devoted only 10 seconds one day and 30 seconds the next to announcing the performance of American women in winning seven of the eight United States medals at the 1972 Winter Olympics while doing in the same monitoring period a two-minute-fifteen-second story during sports news on a women's pancake-eating contest.
 
 
 24
 The Commission's refusal to order an evidentiary hearing on these and other examples of what NOW termed ABC's "discriminatory weighting of news items" appears consistent with Commission policy. Generally the licensee's news judgment will not be questioned unless there is extrinsic evidence of deliberate distortion or news staging, CBS Program, "Hunger in America,"[40] or unless the licensee consistently fails to report news events of public importance that could not in good faith be ignored, Radio Station WSNT, Inc.[41] In this case, as the Commission found, NOW does not allege "deliberate distortion or news staging" and demonstrates by its own monitoring that ABC did not "ignore" the news on women's issues.
 
 
 25
 To the extent that NOW is really disagreeing with the licensee's judgment as to newsworthiness or the licensee's process of selection and presentation, the Commission has quite properly been reluctant to intrude into this sensitive area. The exercise of such editorial discretion, especially in connection with news reporting, sharply implicates First Amendment values, see Columbia Broadcasting System v. Democratic National Committee.[42] Particularly where the Commission has available other methods, which are less intrusive on the First Amendment, for assuring that licensees provide fair and balanced coverage of news on women's issues,[43] there is less justification for direct Commission review of editorial news judgment.
 
 
 26
 2. NOW also challenges the sufficiency of the public affairs programming on women's topics. In its Petition to Deny NOW notes, for example, that, "(o)n March 19, 1971, one hour of prime time was preempted for a documentary focused on the American Bald Eagle" and that still more prime time was preempted for programs on underwater life.[44] Since, in NOW's estimation, there were not enough prime time preemptions for specials on women's issues, NOW seeks a hearing to explore "such discriminatory weighing of programming."[45] While a gross disparity in the allocation of programming time devoted to a large minority population might indicate a licensee's failure to serve community needs, Alianza Federal de Mercedes v. FCC,[46] in this case the Commission could and did point to numerous programs, even excluding news coverage, which did address the problems of women. NOW, however, disputes the characterization by the Commission that all of these shows, cited at note 39, supra, really were responsive to women's needs. NOW considered Dick Cavett to have treated women guests in a "demeaning" fashion[47] and particularly objected to the "stereotypical" treatment of the male interviewer on A.M. New York.[48] The Commission regarded such clashes as "highly subjective in nature" and refused to hold a hearing, much as it did in Taft Broadcasting Company[49] where programming was claimed to be "bland" and "derogatory."
 
 
 27
 3. There is still another reason why an evidentiary hearing might be inappropriate. With regard to claims both about responsive programming and the fairness doctrine, "it is evident that (NOW's) grievances transcend this particular station and that the faults are regarded as endemic of television institutionally. Considering that apparent universality, it seems wasteful to thrash out the broader and more widely applicable programming issues in the context of a single renewal case." Commissioner Hooks thus concluded: "Rather than multiple, ad hoc, proceedings I really prefer an overall inquiry . . . on this subject."[50] Our court has taken into account in denying an individual hearing that an industry-wide problem may be more appropriately aired and an industry-wide remedy formulated in a general inquiry, such as a rule-making.[51] This is not to suggest, as Commissioner Hooks does, that this court will necessarily order individual hearings unless the Commission undertakes such a general inquiry. The decision whether to institute industry-wide studies, such as the Commission's wide-ranging inquiry into children's programming and advertising practices,[52] still rests largely in the discretion of the Commission.
 
 B. The Fairness Doctrine
 
 28
 In these cases the Commission reviewed the performance of the licensees under the fairness doctrine with respect first, as to whether there has been a discussion of a controversial issue of public importance, and second, if so, as to whether a reasonable opportunity has been afforded for the presentation of contrasting views in its overall programming. In reviewing complaints of abuse by licensees the Commission limits its determination as to whether licensees acted reasonably or in good faith, Fairness Report,[53] a standard of review approved,[54] if not mandated[55] by this court. Finally the review is conducted in light of the overall goal of the doctrine that, "the American public must not be left uninformed." Green v. FCC.[56]
 
 
 29
 The Commission below concluded that neither ABC[57] nor WRC[58] had abused its discretion in meeting its obligations under the fairness doctrine. All parties agreed that a woman's role in society is a controversial issue of public importance, one that warrants, therefore, some balance in the presentation of conflicting viewpoints. The Commission found that the overall programming of ABC did not leave the public uninformed on this issue, citing in support the programming that it had earlier found responsive to the needs and interests of women.[59] The Commission also found that WRC had broadcast a number of programs relating to "women qua women," citing some examples[60] and having cited earlier the licensee's examples.[61] NOW also claimed that WRC had violated the fairness doctrine in its news coverage of women's topics, a contention similar in substance to NOW's charge against ABC, discussed at Part II, A, supra and rejected by the Commission for the same reasons.[62]
 
 
 30
 On appeal NOW seeks a hearing on various issues related to the Commission's determinations. Before a "controversial issue of public importance" must be accorded "balanced" treatment, there must have been a meaningful "discussion" of that issue. Fairness Report. Obviously, the extent of "discussion" that is made available to one side is an important point of reference in determining the adequacy of balance afforded a conflicting viewpoint. NOW contends that the Commission erred in deciding that the portrayal of women's roles in entertainment and commercial programming did not constitute a "discussion" of this controversial issue. If the Commission was wrong on this threshold decision, NOW argues, then the overall programming of ABC and WRC must be considered unbalanced on the role in violation of the fairness doctrine. NOW thus seeks a hearing to resolve any disputed evidentiary points and to help formulate a remedy.
 
 
 31
 Two monitoring studies by NOW provide the factual basis for its contentions, the ABC study noted supra at Part II-A, and a similar survey of WRC programming. In brief, NOW submits that each survey shows that "the entire program day of the challenged station is saturated with a distorted and stereotyped portrayal of women."[63] By consistently depicting women in "narrowly circumscribed stereotypical roles those of housewife and mother" and by reinforcing the "stereotype of women as incompetent, dependent, over-emotional and irresponsible," the programming of each station, according to NOW, "day after day . . . hammer(s) home the theme that women's proper role is in the home, that women spend most of their time and ought to spend most of their time serving their husbands and children, and finally that even outside the home, women are capable of little more than limited service roles."[64] In the record before the Commission NOW sought to substantiate its contentions through statistics, descriptions and excerpts. In the WRC study, for example, "only 21% of the working characters on dramatic programs were female" and "78% of the women, but only 5% of the men selling products in commercials were in domestic roles."[65] Conversely, according to NOW, "(d)uring the composite week, all WRC quiz shows were hosted by men" and "(i)n commercials aired by WRC during the composite week, 93% of the voice-overs giving the authoritative word on the product were male."[66] In the study of ABC, NOW reported, for example, that, "(i)n ads for baby products monitored, only women were shown as direct users of the product emphasizing that child care is a woman's job, never a man's."[67] NOW also found about ABC that: "On all the dramatic programs monitored, (excluding soap operas), only 35 women appeared in working roles. 5 were housekeeper-maids, 2 were nurses, 6 were teachers, 9 were secretaries; and 6 were aspiring actresses. Only 7 of the 35 women, or 20% of all women shown, were cast in professional, managerial or blue-collar jobs."[68]
 
 
 32
 In addition to the many numerical tabulations, NOW presented the Commission with many descriptions of what it considered stereotypical programming. In chronicling a "typical" day at WRC, NOW covered the full range of broadcasting: from quiz show and soap operas[69] through news and situation shows[70] to late-night entertainment.[71] NOW also described various WRC commercials.[72] In addition to such descriptions, the NOW study of ABC also contains illustrative direct quotations.[73]
 
 
 33
 In deciding whether the licensees' presentation of women constituted a "discussion" of their role in society, the Commission acknowledged, as it has before, that controversial issues may be raised by implication in entertainment programming and commercials and quoted the current standard as to ads, also applicable to entertainment programming: "If the ad bears only a tenuous relationship to (an ongoing public) debate, or one drawn by unnecessary inference the fairness doctrine would clearly not be applicable."[74] The Commission found that NOW's claims about WRC involved too "tenuous" a relationship to the issue of a woman's role. "In particular," the Commission stated, "petitioners' descriptions of women's roles portrayed on WRC-TV are too insubstantial or ambiguous for us to determine that the mere playing of the roles transmits any clear or singular message demonstrably linked to a controversial issue of public importance."[75] With regard to ABC's programming as well, the Commission again perceived too "tenuous" a link, that is, that the NOW claims about the programming did not "amount to advocacy of a position" on the issue of a woman's role.
 
 
 34
 NOW's response is essentially that the Commission's conclusion is naive. According to NOW, this conclusion "flies in the face" of other findings that the media presents an "inaccurate and frequently belittling portrayal of women"[76] and that this portrayal has a real impact on society's values. For example, NOW quotes from one authority that: "(C)ommercially produced television programs viewed by American children do indeed carry different messages about the appropriate behavior for males and females. Given past evidence on the effectiveness of modeling in general and on television in particular as a medium for teaching behavior, this implies that for today's children, television may be an important source in the learning of stereotyped roles."[77] NOW points to an instance where this court directed the Commission to hold a hearing on charges of race discrimination in programming, Office of Communication of United Church of Christ v. FCC,[78] and suggests that it represents an apt analogy to these cases.[79]
 
 
 35
 This court does not need to decide the question of whether the licensees' portrayal of women amounted to a "discussion" of their role in society because, even assuming that it did, the licensees in these cases appear to have afforded a reasonable opportunity for conflicting viewpoints to be aired. In both cases the Commission stressed that it reviewed the reasonableness of the licensees' efforts in light of its overall programming, thus taking very directly into account all the programming that the Commission had explicitly found to meet the obligation of broadcasting programs responsive to the needs and interests of women. Taking this overall look, it appears that the Commission did not find that the licensees "left the public uninformed on the present issue of women's role in society"[80] even assuming, for example, that their "entertainment programming could contribute to the raising of a controversial issue."[81] The Commission approach under the fairness doctrine of looking at the overall programming and of not requiring any scientific or mathematical equality in the balance afforded contrasting views is rooted in the stated policy of the Commission[82] and has repeatedly been approved by this court.[83] We find, therefore, that the Commission has not acted arbitrarily or capriciously in these cases.
 
 IV. EMPLOYMENT PRACTICES
 
 36
 Following notice[84] and comment the Commission adopted rules in 1969 which required broadcast licensees not to discriminate in employment on the basis of "race, color, religion or national origin" and to undertake equal employment opportunity programs that would entail positive efforts to recruit, employ and promote qualified minorities.[85] The next year the Commission adopted a "Form 395" for the annual reporting of employment statistics and, in the same proceeding, added sex as a prohibited basis of employment discrimination.[86] With another new rule, effective 4 February 1972 the licensees were required to include women in the equal employment opportunity (EEO) programs filed with the Commission.[87] Most recently, the Commission has adopted rules calling upon licensees to submit more detailed EEO programs and, for stations with over 50 full-time employees, more detailed employment profiles.[88]
 
 
 37
 In its pleadings in the ABC renewal, NOW argued that the "poor statistical comparison" between the percentage of women on the ABC staff and the percentage of women in the area's work force constituted a prima facie showing of sex discrimination,[89] particularly as the EEOC, on the basis of similar employment statistics, had found reasonable cause to believe that WRC-TV had engaged in discriminatory employment practices. NOW also challenged ABC's EEO program as insufficient, submitted specific allegations of employment discrimination against women and pointed out that ABC violated EEOC guidelines in failing to provide paid maternity leave.
 
 
 38
 The Commission found none of these factors to warrant an evidentiary hearing. It regarded the aggregate statistics on the female workforce as falling within a "zone of reasonableness" and declined to draw any inferences from the EEOC determination about WRC-TV. Finding the terms of the EEO plan adequate, the Commission took special note of the "substantial progress" that ABC had made in meeting its self-imposed goals and timetables.[90] According to the Commission, a review of the affidavits left no material support for the specific charges of employment discrimination. As for maternity leave, the Commission was satisfied with the ABC assurance that it would comply with the EEOC guideline if it was upheld in then current litigation.[91]
 
 
 39
 In the WRC renewal the contentions of NOW and their disposition by the Commission roughly parallel the ABC renewal, with the Commission again taking note that the EEO "program appears to be an operating success, as revealed by the licensee's Annual Employment Reports for 1973 and 1974."[92] The major difference was that on 19 January 1973, on a complaint filed against the licensee by 27 female employees, the EEOC found "reasonable cause to believe" that WRC was guilty of discriminatory employment practices. In relevant part, the EEOC found that WRC violated Title VII "(1) by maintaining segregated job classifications and/or limiting employment of females in other categories; (2) by discriminating against females in its recruitment policies."[93] Because the EEOC decision constituted a preliminary finding which authorized negotiated conciliation between the EEOC and the employer,[94] the Commission deemed it proper to defer action until later resolution by the EEOC or the courts. Upon being notified that the conciliation process was at an impasse and, for all practical purposes, at an end, the Commission obtained a temporary remand from this court and issued a supplemental opinion. In connection with the remand, WRC was asked by the Commission to supply more detailed employment information, such as lists of new hirings and promotions.
 
 
 40
 The initial question for the Commission was whether to regard the EEOC finding as automatically sufficient to warrant a hearing. Due to a different reading of the EEOC's function from its own, the Commission said no, that the determination of the effect of the EEOC finding upon a license renewal would ultimately rest with it. The EEOC was created directly to enforce Title VII, and, in particular, the Commission said, to attempt "to make aggrieved persons whole." The Commission, on the other hand, developed its rules against sex discrimination, akin to Title VII, pursuant to its duty and power to regulate licensees under the Communications Act "in the public interest." Its concern is not with providing a remedy for an aggrieved party but with assuring that the licensee's overall record reflected compliance with EEO rules. Its approach, the Commission stated, "is prospective, seeking to lead a licensee who has not possessed an adequate affirmative action program in the past to adopt policies ensuring an active recruitment program and genuine equal employment opportunity in the future."[95]
 
 
 41
 From this "prospective" approach the Commission carefully examined the new employment data submitted by WRC in order to determine if the EEO program was succeeding or if the presence of arbitrary employment barriers, suggested by the EEOC findings, persisted. Hiring and promotion data showed that women and minorities (scrutinized sua sponte by the Commission) were generally proportionately participating. Crucial to this progress, in the Commission's view, was their participation in WRC's vacation-relief training program: "In 1973, 1974 and 1975, a total of 134 employees participated in the program which provides the opportunity to qualify for permanent positions as engineers, writers, announcers, etc. Of the total vacation-relief personnel, 59, or 44 percent were women and 59, or 44 percent, were minorities."[96] Also taking into account the narrowing in the salary disparities for similar job groupings, the Commission found that WRC was in present compliance with EEO rules and had taken "significant steps" to correct the effects of past discrimination against women; it, therefore, found no basis for NOW's petition for a hearing.[97]
 
 
 42
 These cases present two important questions for this court on appeal. The first is whether the Commission acted unreasonably in holding that the EEOC's "probable cause" finding under Title VII did not raise substantial and material questions of fact concerning WRC's 1972 renewal. The second, and related question is whether the Commission appropriately considered post-license term employment data in determining licensee compliance with its equal employment standards.
 
 
 43
 Our inquiry must begin, as the Commission recognized, with an understanding of the respective functions of the Commission and the EEOC in this area. The Commission's review of employment practices is based upon its mandate under the Communications Act to regulate broadcasting in the "public interest." The scope of the power delegated by these words "take(s) meaning from the purposes of the regulatory legislation." National Association for the Advancement of Colored People v. FPC.[98] Thus, the Commission considers the employment practices of its licensees to the extent those practices affect the obligation of the licensee to provide programming that "fairly reflects the tastes and the viewpoints of minority groups,"[99] and to the extent those practices raise questions about the character qualifications of the licensee.[100] The Commission is hence not charged directly with the enforcement of Title VII under its "public interest" mandate. Congress, rather, "centralized (that) responsibility in the EEOC."[101] As an agency with a different mission than the EEOC, the Commission may properly employ different standards: a finding by the EEOC that a licensee's employment practices may be[102] in violation of Title VII of the Civil Rights Act does not necessarily mean that the same finding raises an issue under the Communications Act. This is not to say, of course, that the Commission could safely ignore in its ultimate determination about renewal a clearly relevant finding by an expert agency. Rather the Commission must evaluate the finding carefully and fully in light of its own established standards. If the Commission here, for example, had not itself sought out more detailed data from WRC about its hiring and promoting; it may have been under some obligation to NOW to afford it some discovery from WRC so that the effectiveness of its EEO plan could be fairly assessed.[103]
 
 
 44
 Judged by its established standards, did the Commission act unreasonably in concluding that the NOW Petition, in light of the EEOC finding, did not warrant a hearing? An evidentiary hearing, it must be remembered, is not required when facts are undisputed or when the dispute rests on "inferences to be drawn from facts already known and the legal conclusions to be derived from those facts."[104] Initially, the Commission looked at the bare percentages of women employed and determined that the figures were within a " zone of reasonableness" approved by Stone[105] and other cases.[106] In affirming the application of the "zone" of 1972 in these cases, we reiterate our view from Bilingual that the "zone" is not a "final codification"[107] but evolves over time. As the EEO plans have additional time to yield results, the Commission can be expected to adopt a more stringent view of the acceptable "zone," as indeed the Commission already appears to be doing.[108]
 
 
 45
 Moreover, the increasing tenure of EEO plans may allow for other perspectives on the "zone" which are in keeping with its rationale. For example, in the ABC case here, the Commission used only the aggregate proportion of women staff for the "zone" determination,[109] over a NOW objection that the Commission should also make a "zone" inquiry about the upper job levels, like professionals or managers. If a primary justification of the FCC rules is to ensure that programming fairly reflects the viewpoints of minority groups, then the "zone" inquiry about minimal representation should surely extend separately to the upper job levels, where the important policy and editorial decisions about programming are made.[110]
 
 
 46
 Our observation, however, should not be read to indict the Commission's approach to the 1972 figures, since the formal EEO initiative on sex discrimination had just commenced. Indeed, WRC points out that its percentage of women employees was about typical of the industry and makes a further undisputed contention that EEOC "(f)indings such as those made on the basis of WRC-TV's 1971 employment statistics could undoubtedly have been made with respect to the statistics at that time of virtually all stations and, indeed, could have been made with respect to almost any business, government agency, or institution then investigated."[111] Thus, if these statistics had warranted a hearing, the Commission would have had hearings about virtually all license renewals at that time.
 
 
 47
 With the recognition that "the history of employment discrimination against women is (already) amply demonstrated,"[112] the Commission has decided to focus "prospectively," with its primary concentration on EEO plans that seek to erase the causes of past discrimination. Where the Commission believes these plans to be deficient, it has sought to correct them largely through remedial action, such as conditional grants[113] or short-term renewals,[114] although it will order a hearing in what it considers an "extreme" case.[115] Since a plan's effectiveness is best measured by its results, the Commission examines employment data over a significant period of time. And, in fact, this court without discussion has also looked to post-term employment data.[116]
 
 
 48
 NOW and the EEOC urge us, however, to declare that post-term improvement should be accorded little if any weight. We are asked to extend the holding of Office of Communication of United Church of Christ v. FCC[117] and the policy of the Commission[118] that post-term improvement in programming will be discounted in a license renewal. At the outset we again emphasize the distinct relevance of overall employment data to the realistic monitoring of EEO progress. If WRC's post-term record showed that few women were hired or promoted, suggesting a "passive" EEO plan, would NOW also wish the Commission to exclude that evidence from its determination to call a hearing or invoke some other remedy?
 
 
 49
 NOW argues that the admissibility of post-term employment data "discourages citizen-group monitoring of licensees' employment policies" because if a group challenges the poor performance of a station, the station can avoid a hearing by improving its employment of women after the Petition to Deny is filed. But if the Commission denies a hearing only because a station's EEO plans do show substantial gains for minorities and women, as WRC's plans did here, then it is difficult to appreciate NOW's contention here that, "(t)he FCC's refusal to hold a hearing sounds the death knell for future progress in equal employment opportunity in broadcasting."[119] Moreover, citizen pressure is not the only impetus for a station to improve; as noted, for example, the Commission is steadily contracting the "zone of reasonableness." In addition, citizen incentive to monitor results presumably remains since the policy of continued admissibility of employment data means that poor or negative results will also be relevant to a renewal decision.
 
 
 50
 NOW further argues that the results of affirmative action are "totally irrelevant if WRC's employment practices violated the law (Title VII) at the time the station filed its renewal application."[120] The implication is that since such data is irrelevant, it is also pointless to admit it. As this opinion has explained, however, the Commission's role is not to adjudicate past violations of Title VII but rather to determine if a licensee is in compliance with its own EEO rules. It is, therefore, not an abuse of the Commission's discretion for it to measure the adequacy of EEO plans in part by their results. Nor is the Commission policy inconsistent with its usual discounting of improvements in programming. The Commission may rationally regard changes in programming as too subject to manipulation and hence unreliable to be accorded much weight while treating employment changes differently as being more permanent and significant.[121]
 
 
 51
 For all the reasons discussed above, the orders of the Commission denying NOW's two Petitions to Deny are accordingly
 
 
 52
 Affirmed.
 
 
 
 [1]
 47 U.S.C. § 309(d)
 
 
 [2]
 American Broadcasting Co., Inc., 52 F.C.C.2d 98; National Broadcasting Co., Inc., 52 F.C.C.2d 273
 
 
 [3]
 The appeals are taken pursuant to 47 U.S.C. § 402(b)(6)
 
 
 [4]
 National Broadcasting Co., Inc., 58 F.C.C.2d 419
 
 
 [5]
 47 U.S.C. § 309(d)(1)
 
 
 [6]
 164 U.S.App.D.C. 213, 505 F.2d 320, 324 (1974), citing Stone v. FCC, 151 U.S.App.D.C. 145, 466 F.2d 316 (1972). See also Alianza Federal de Mercedes v. FCC, 176 U.S.App.D.C. 253, 539 F.2d 732 (1976)
 
 
 [7]
 27 F.C.C.2d 650. See generally Bamford v. FCC, 175 U.S.App.D.C. 250, 535 F.2d 78 (1976)
 
 
 [8]
 27 F.C.C.2d at 683 (Question 10)
 
 
 [9]
 Ibid
 
 
 [10]
 52 F.C.C.2d at 105
 
 
 [11]
 52 F.C.C.2d at 106
 
 
 [12]
 57 F.C.C.2d 418, 442 (Question 7) (1976)
 
 
 [13]
 27 F.C.C.2d at 685 (Question 18) (emphasis added)
 
 
 [14]
 21 F.C.C.2d 729, 747 (1970)
 
 
 [15]
 As this court noted in Bamford v. FCC, 175 U.S.App.D.C. 250, 535 F.2d 78, 81 (1976): "(W)hatever other factors may have contributed to the haphazard ascertainment showing involved here, certainly the inadequacy of the composition study played a direct role. The composition study serves as the basis for the survey of 'leaders' of significant groups, and is therefore a crucial component of a community needs survey."
 
 
 [16]
 These were from the Girl Scouts, the City and State Human Rights Commissions, the Stamford Day Care Center and the Nassau County Vocational Center for Women. Joint Appendix (J.A.) at 47-48
 
 
 [17]
 J.A. at 299
 
 
 [18]
 Affidavit of Muldowney, J.A. at 302
 
 
 [19]
 J.A. at 300
 
 
 [20]
 Affidavit of Wathen, J.A. at 304
 
 
 [21]
 Affidavit of Norton, J.A. at 171. She recommended that the media portray women in less stereotyped roles and that it direct more public affairs programming at the interests of women
 
 
 [22]
 Affidavit of Muldowney, J.A. at 302
 
 
 [23]
 The consistent position of the Commission has been that reactions about a station's programming or its employment practices are not directly relevant to the purpose of the interview. Mahoning Valley Broadcasting Corp., 39 F.C.C.2d 52 (1972)
 
 
 [24]
 Community Leader Survey Guidelines, J.A. at 298. The Primer, as well, encourages interviewers to be sensitive to leads: "We expect . . . that the applicant will guide the consultations so as to elicit community problems. In this regard, if a person offers program suggestions, further questioning by the applicant may elicit a more detailed picture of community problems." 27 F.C.C.2d at 669
 
 
 [25]
 Ascertainment Report, J.A. at 301
 
 
 [26]
 Affidavit of Spanier, J.A. at 173
 
 
 [27]
 Affidavit of Gannon, J.A. at 306
 
 
 [28]
 52 F.C.C.2d at 108
 
 
 [29]
 27 F.C.C.2d at 664. See Voice of Dixie, Inc., 45 F.C.C.2d 1027, 1029 (1974)
 
 
 [30]
 In Bamford, supra, for example, the Commission held that Bamford took an erroneous view of the term "leader" in its ascertainment. The question before the court was whether Bamford formulated its view with sufficient notice from the Primer that it was wrong
 
 
 [31]
 Still another question might be whether ABC interviewed enough leaders of the women's movement. Generally the Commission does not require that specific numbers of leaders be interviewed but only a representative range. The Outlet Company, 38 F.C.C.2d 355 (1972). But if the ABC consultations with leaders of the women's movement have to be discounted for all the reasons herein, it may be that the effect would be that ABC failed to ascertain the women's movement at all. Such a failure has been recognized as a major deficiency with respect to the ascertainment of racial minorities. Cosmos Broadcasting Corp., 21 F.C.C.2d 729 (1970)
 
 
 [32]
 151 U.S.App.D.C. 145, 466 F.2d at 325
 
 
 [33]
 See supra n.12
 
 
 [34]
 57 F.C.C.2d at 442 (Question 9) (emphasis added)
 
 
 [35]
 It is the "contact" function of the ascertainment that particularly calls for the extra effort. The station must be vigorous in seeking to "establish dialogues" with leaders of the women's movement who may have been improperly overlooked in the past
 
 
 [36]
 Stone v. FCC, supra at 327
 
 
 [37]
 52 F.C.C.2d at 114
 
 
 [38]
 Stone v. FCC, supra at 328. Accord Alianza Federal de Mercedes v. FCC, supra at 738
 
 
 [39]
 The Commission listed, 52 F.C.C.2d at 112: a one-hour documentary, "Anatomy of Welfare," depicting the problems of welfare mothers; two half-hour prime time segments of the documentary series "NOW," including "Women's Liberation" and "We Have Met the Enemy and He Is Us" (issues of population explosion, abortion and birth control); "Life, Death and the American Women," a one-hour prime time documentary, dealing with physiological problems unique to women, such as pregnancy, menopause, breast cancer; and three half-hour segments of the documentary series "Directions," dealing with the changing role of women in established religions "Feminism in the Church," "Women in the Temple" and "Women in Catholicism." The Commission also noted that five of the one and one-half hour shows of the Dick Cavett Show were devoted to women's issues, including evenings with Margaret Mead and Germaine Greer, and that substantial portions of the locally produced A.M. New York and the syndicated What Every Woman Wants to Know concerned women's issues
 
 
 [40]
 20 F.C.C.2d 143, 150-151 (1969)
 
 
 [41]
 27 F.C.C.2d 993, 995 (1971)
 
 
 [42]
 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973)
 
 
 [43]
 As will be developed more fully later, infra at III, the Commission has pursued a policy of equal employment opportunity, which covers sex discrimination, in order "to ensure that its licensees' programming fairly reflects the tastes and viewpoints of minority groups." National Association for the Advancement of Colored People v. Federal Power Commission, 425 U.S. 662, 670, n. 7, 96 S.Ct. 1806, 1812, 48 L.Ed.2d 284, n. 7 (1976)
 
 
 [44]
 J.A. at 83 (emphasis original)
 
 
 [45]
 Ibid
 
 
 [46]
 539 F.2d at 738
 
 
 [47]
 J.A. at 87
 
 
 [48]
 The NOW monitoring study describes the 5th of May show as follows:
 In his interview with Ellen Peck, the author of The Baby Trap, a book discussing women's alternatives to child bearing, Mr. Tucker accused Ms. Peck of being a "hedonist," and spent more time discussing personal issues such as her age and feeling about growing old, rather than interviewing her on the subject of her book.
 
 
 [49]
 38 F.C.C.2d 770, 792 (1973)
 
 
 [50]
 National Broadcasting Co., Inc., (WRC), 52 F.C.C.2d at 298 (concurring in part, dissenting in part) (programming issues incorporated by reference in ABC case)
 
 
 [51]
 Hale v. FCC, 138 U.S.App.D.C. 125, 425 F.2d 556, 560 (1970); Stone v. FCC, supra at 331
 
 
 [52]
 Petition of Action for Children's Television, 50 F.C.C.2d 1 (1974)
 
 
 [53]
 48 F.C.C.2d 1, 9 (1974), reaffirmed on reconsideration, 58 F.C.C.2d 691, 697 n. 9 (1976)
 
 
 [54]
 Neckritz v. FCC, 163 U.S.App.D.C. 409, 502 F.2d 411, 418 (1974); Healey v. FCC, 148 U.S.App.D.C. 409, 460 F.2d 917, 920 (1972); Democratic National Committee v. FCC, 148 U.S.App.D.C. 383, 460 F.2d 891, 900 (1972)
 
 
 [55]
 Straus Communications, Inc. v. FCC, 174 U.S.App.D.C. 149, 530 F.2d 1001, 1011 (1976)
 
 
 [56]
 144 U.S.App.D.C. 353, 447 F.2d 323, 329 (1971) (italics omitted)
 
 
 [57]
 52 F.C.C.2d at 116
 
 
 [58]
 52 F.C.C.2d at 287
 
 
 [59]
 See supra note 39
 
 
 [60]
 "These include, among others, 'You've Come A Long Way, Maybe,' Wife-Mother, Not Enough, The Women Demand Equal Rights, You . . . and Women's LIB, Community Tideline, and Feminism." 52 F.C.C.2d at 287
 
 
 [61]
 "By example, the licensee points to its prime-time documentary You've Come a Long Way, Maybe, which it claims presented a full spectrum of views from feminist leaders to those of anti-feminist groups; the station's editorials in favor of the ERA and opposing views raised in its By the People program; and station editorials favoring liberalized abortion laws and responsive opposition editorials." 52 F.C.C.2d at 284
 
 
 [62]
 NOW contends, for example, that although WRC did report on the passage of the Equal Rights Amendment in Congress, it was not full or fair enough. NOW contrasts the minute of news air time that the passage of the ERA received with the provision by WRC of "approximately two minutes to the mere introduction of a bill providing equal rights for the handicapped." NOW Brief (WRC) at 46. Presumably NOW seeks a hearing to explore WRC's "discriminatory weighting of news items." NOW Br. (ABC) at 35. The Commission properly declined such an invitation
 
 
 [63]
 NOW Br. (ABC) at 25
 
 
 [64]
 NOW Br. (ABC) at 44
 
 
 [65]
 NOW Br. (WRC) at 51-52
 
 
 [66]
 NOW Br. (WRC) at 52
 
 
 [67]
 NOW Br. (ABC) at 47
 
 
 [68]
 Petition to Deny at 79; J.A. at 104
 
 
 [69]
 "Days of Our Lives (2 P.M.): All of the adult male leads on this daily soap opera are professional persons, but only one of the female leads is. Although she is a doctor, she is shown only in terms of her relationship with her brother-in-law, husband and child. When testifying before a medical examining board on behalf of her brother-in-law, who has lost his license for some reason, she is asked if she is speaking as a doctor or a 'a woman in love.' Thus in the only appearance by a woman in a professional capacity, her credibility is questioned. Meanwhile, her sister-in-law is told by a male friend that 'The complete woman is the sensual woman.' " J.A. at 144
 
 
 [70]
 "Adventure Theater (8 P.M.): 'The Lady is My Wife,' tonight's feature, centers around one man's attempt to buy or win another man's wife. At one point the two men play billiards, with the wife as the prize. When the husband loses, he says he was joking. The other man then offers money for the woman but her husband refuses. The husband finally tells his wife that he 'owned all of her.' " J.A. at 146
 
 
 [71]
 "The Tonight Show (11:30): This show, hosted by a male, is rampant with jokes, skits and remarks that are degrading to women. Women guests are often skantily (sic ) clad and sexy, and women frequently serve as the joke material for the male guests. A typical joke on tonight's program: 'What (political) position would you have a woman take horizontal?' 'How about back to back?' " J.A. at 147
 
 
 [72]
 Examples:
 "A husband complains that the toilet bowl needs cleaning, so the wife cleans it with Sani-Flush while he watches approvingly." J.A. at 147.
 "In a spot by the American Dairy Council, a rather nondescript woman drinks milk and is transformed into a sex-pot who is now able to attract a man." J.A. at 148.
 
 
 [73]
 Examples:
 "On 'All My Children' one pregnant woman wants an abortion. Her mother says, 'Every girl should welcome pregnancy. It's such a joy.' " NOW Br. (ABC) at 45.
 "On 'That Girl,' a situation comedy monitored on May 7, heroine Ann-Marie says 'I haven't had any children; I'm not a real woman.' " Ibid.
 
 
 [74]
 52 F.C.C.2d at 116, 287, quoting Fairness Report, 48 F.C.C.2d at 23. The quotation above was taken from a discussion of the application of the fairness doctrine to institutional advertising, such as by oil companies. With respect to the doctrine's application to advertisements for commercial products or services, the Fairness Report repudiated the case which applied the fairness doctrine to cigarette advertising, WCBS-TV, 9 F.C.C.2d 921 (1967), aff'd sub nom. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). The First Circuit has upheld the legality of the Commission's withdrawal, Public Interest Research Group v. FCC, 522 F.2d 1060 (1st Cir. 1975), cert. denied, 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976) (snowmobile advertising). Underpinning the Commission's withdrawal was its judgment that "the usual product commercial can (not) realistically be said to inform the public on any side of a controversial issue of public importance." Fairness Report, 48 F.C.C.2d at 26
 
 
 [75]
 52 F.C.C.2d at 287
 
 
 [76]
 NOW Br. (ABC) at 42, quoting Citizens Advisory Council on the Status of Women, Women in 1974 (1975)
 
 
 [77]
 Sternglanz and Serbin, Sex Role Stereotyping in Children's Television Programs, 10 Devel. Psych. 710 (1974)
 
 
 [78]
 123 U.S.App.D.C. 328, 359 F.2d 994 (1966)
 
 
 [79]
 The Commission did not discuss or distinguish United Church of Christ in its opinions here. Intervenor NBC, however, argues that it is not "remotely similar." NBC Br. at 54. In that case the Commission was presented with documented instances of news distortion supported by extrinsic evidence and documented allegations of deliberate violation of the fairness doctrine by the station in its treatment of racial issues and deliberate exclusion of blacks by the station from access to its facilities. NBC notes that no such allegations were made in these cases
 
 
 [80]
 American Broadcasting Co., supra at 116
 
 
 [81]
 National Broadcasting Co., supra at 286
 
 
 [82]
 Fairness Report, supra at 11, 16-17
 
 
 [83]
 E. g., Brandywine Main Line Radio, Inc. v. FCC, 153 U.S.App.D.C. 305, 473 F.2d 16, 44 (1972)
 
 
 [84]
 Nondiscrimination Employment Practices of Broadcast Licensees, 13 F.C.C.2d 766 (1968)
 
 
 [85]
 18 F.C.C.2d 240. See 29 C.F.R. § 73.680
 
 
 [86]
 23 F.C.C.2d 430 (1970)
 
 
 [87]
 Equal Employment Program, 32 F.C.C.2d 831 (1971)
 
 
 [88]
 Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 60 F.C.C.2d 226 (1976)
 
 
 [89]
 According to the Form 395 for 1971 ABC employed 44 women out of 189 employees (23.3%). Eight women were employed as managers, professionals and technicians 5.7% of such jobs; the other 36 women were employed in clerical positions 72% of such jobs. Women comprised 52.6% of the New York area population and approximately 40.3% of the area's workforce
 
 
 [90]
 "For example, where ABC has promised to increase the number of women officials and managers from four to nine and professionals from twelve to twenty-one, the 1973 report (Form 395) indicates that seven and seventeen women, respectively, are now so employed." 52 F.C.C.2d at 122 n.38
 
 
 [91]
 This Term in General Electric Company v. Gilbert, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) the Supreme Court rejected the EEOC guideline, ruling that the failure of a private employer to provide paid maternity leave was not illegal sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. (referred to herein as Title VII.)
 
 
 [92]
 52 F.C.C.2d at 294. In 1972 WRC employed 227 full-time persons, of whom 51 were women and 11 were in the upper four job categories (official and managers, professionals, technicians, and sales workers). The Commission considered this 22.5% of women as within a "zone of reasonableness" in comparison with their 48% of the area workforce but was troubled because while 88% of the station's male staff were in the upper four categories only 24.4% of the female staff were in these higher paying, more responsible positions. Thus, the Commission particularly noted that in 1973 the female staff increased to 28% of which 33% were in the upper four job categories, and in 1974 the female staff again increased to 33%, with 40% of women in the upper four job categories
 
 
 [93]
 See 52 F.C.C.2d at 291. The EEOC findings were investigatory and were not based upon any adjudication. These findings were drawn inferentially from statistics, like salary disparities, and from employment practices, like word-of-mouth recruiting, which were seen to have a discriminatory effect. The EEOC did not credit any charge that the station had discriminated against specific individuals. Its further objection to WRC's maternity leave policy has since been taken out of this case, supra n. 91
 
 
 [94]
 See 29 C.F.R. § 1601.19b
 
 
 [95]
 58 F.C.C.2d at 422
 
 
 [96]
 58 F.C.C.2d at 425-26
 
 
 [97]
 Ibid. The previous year, 16 September 1975, the Commission had granted WRC's 1975 renewal application. No petition to deny the 1975 renewal was filed by any party. Interested citizens again have the opportunity to challenge the adequacy of the station's equal employment efforts and results when the license comes up for renewal in 1978
 
 
 [98]
 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976)
 
 
 [99]
 Id. at n. 7, 96 S.Ct. at 1812. See supra n. 43
 
 
 [100]
 See 13 F.C.C.2d at 769
 
 
 [101]
 NAACP, supra at 96 S.Ct. at 1813 (Burger, C. J.) (concurring opinion)
 
 
 [102]
 An EEOC determination of "probable cause" does not appear by itself to constitute a prima facie case before a federal court in a Title VII discrimination complaint. The complaining party still has the initial burden of establishing a prima facie case of discrimination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)
 
 
 [103]
 Cf. the counsel of this Court in Bilingual Bicultural Coalition v. FCC, 160 U.S.App.D.C. 390, 492 F.2d 656, 659 (1974). See also our pending cases at Bilingual Bicultural Coalition v. FCC (D.C. Cir. 1977), vacated by order of the court to be reheard en banc, (27 June 1977), which will consider whether discovery should be made available for those challenging renewal on the grounds of employment practices. We again express a note of hope that new Commission regulations will serve to reduce this problem. As cited earlier, supra n. 88, licensees are called upon to file more detailed reports with the Commission on employment figures and efforts. Such new regulations in our view are generally preferable to the provision of discovery to challengers since the regularly reported information will usually be more uniform and, thus, more comparable, and is often more readily available to the public
 
 
 [104]
 Anti-Defamation League v. FCC, 131 U.S.App.D.C. 146, 403 F.2d 169, 171 (1968)
 
 
 [105]
 151 U.S.App.D.C. 145, 466 F.2d 316, reh. den., 151 U.S.App.D.C. 145, 466 F.2d 331, 332 (1972)
 
 
 [106]
 Our court has subsequently agreed that employment figures were within a "zone of reasonableness" in Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC, 160 U.S.App.D.C. 390, 492 F.2d 656 (1974); Columbus Broadcasting Coalition v. FCC, 164 U.S.App.D.C. 213, 505 F.2d 320 (1974); Alianza Federal de Mercedes v. FCC, 176 U.S.App.D.C. 253, 539 F.2d 732 (1976)
 
 
 [107]
 Bilingual, supra at 659
 
 
 [108]
 In Mission Central Company, 54 F.C.C.2d 581, 586 (1975), the Commission warned that 1975 figures could be outside the "zone" although comparable 1972 figures were inside, saying, "(t)he zone of reasonableness is a dynamic concept, which contracts as licensees are given time to implement our antidiscrimination rules and policy."
 
 
 [109]
 52 F.C.C.2d at 121 n. 36
 
 
 [110]
 In Alianza, supra at 740, our court noted that minority "representation has not been concentrated in the lower paying jobs." This further suggests that aggregate figures should not always be the sole focus of the "zone" test
 
 
 [111]
 Intervenor's Br. (WRC) at 38
 
 
 [112]
 Equal Employment Program, 32 F.C.C.2d at 709
 
 
 [113]
 E. g., Inquiry Into Employment Policies and Practices of Certain Broadcast Stations Located In Florida, 44 F.C.C.2d 735 (1974)
 
 
 [114]
 E. g., Triple X Broadcasting Co., Inc., 51 F.C.C.2d 585 (1975)
 
 
 [115]
 See, e. g., Rust Communications Group, Inc., 53 F.C.C.2d 355 (1975) (station outside "zone" for women and blacks and, in addition, EEO plan not producing results.)
 
 
 [116]
 Columbus Broadcasting Coalition v. FCC, 505 F.2d at 329
 
 
 [117]
 359 F.2d at 1007: With regard to programming misconduct, "a renewal applicant . . . must literally 'run on his record.' "
 
 
 [118]
 See, e. g., Alabama Educational Television Commission, 50 F.C.C.2d 461, 476 (1975)
 
 
 [119]
 NOW Reply Br. (WRC) at 5. Presumably NOW does not seek an evidentiary hearing as an end in itself but rather as a means to ensuring more positive affirmative action results. In the past this court has welcomed "as serving the public interest" public intervention that prompts licensee compliance with Commission rules, even though the petitioner did not succeed in having a license renewal set for hearing, Stone, supra at 332
 
 
 [120]
 NOW Supp.Br. (WRC) at 7
 
 
 [121]
 As a practical matter, employment by a licensee has a permanent aspect; licensees are often free to make complete changes in programming, and frequently do, as witness the switches to all-news or all-music formats among radio licensees, and the replacement with new shows during the TV season to capture more of the viewer market. See generally Citizens Committee to Save WEFM v. F.C.C., 165 U.S.App.D.C. 185, 506 F.2d 246 (1974) (en banc)