655 F.2d 297
 210 U.S.App.D.C. 184, 7 Media L. Rep. 1233
 Sue GOTTFRIED, Individually and on Behalf of the Deaf and
Hearing Impaired Population Within the Stations'
Viewing Area, and Greater Los Angeles
Council on Deafness, Inc., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
National Broadcasting Company, Inc., Community Television of
SouthernCalifornia, Metromedia, Inc., American Broadcasting
Companies, Inc., KCOPTelevision, Inc., RKO General, Inc.,
Golden West Broadcasters, and CBS, Inc.,Intervenors.
 No. 79-1722.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 5, 1980.
Decided April 17, 1981.
 
 Abraham Gottfried, Los Angeles, Cal., and Charles M. Firestone for appellants.
 Randolph J. May, Counsel, F. C. C., Washington, D. C., with whom Robert R. Bruce, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, and Keith H. Fagan and Mary Lee Lindquist, Counsel, F. C. C., Washington, D. C., were on the brief, for appellee. Lisa B. Margolis, Counsel, F. C. C., Washington, D. C., entered an appearance for appellee.
 Timothy B. Dyk, Washington, D. C., with whom J. Roger Wollenberg and Judith Barry Wish, Washington, D. C., (for intervenor CBS, Inc.), James A. McKenna, Jr., Mark D. Roth, and Carl R. Ramey, Washington, D. C., (for intervenor American Broadcasting Companies, Inc.), Michael J. McCarthy, Washington, D. C., (for intervenor Golden West Broadcasters), Howard F. Roycroft, Richard S. Rodin, and Marvin J. Diamond, Washington, D. C., (for intervenor KCOP Television, Inc.), Thomas J. Dougherty and Preston R. Padden, Washington, D. C., (for intervenor Metromedia, Inc.), Bernard Koteen, Arthur B. Goodkind, and Howard Monderer, Washington, D. C., (for intervenor National Broadcasting Company, Inc.), and J. Laurent Scharff and Jack N. Goodman, Washington, D. C., (for intervenor RKO General, Inc.), were on the joint brief, for intervenors CBS, Inc. et al. Margot Smiley Humphrey, Washington, D. C., entered an appearance for intervenor National Broadcasting Company, Inc.
 Edgar F. Czarra, Jr., and Mark D. Nozette, Washington, D. C., were on the brief for intervenor Community Television of Southern California.
 Before McGOWAN, Chief Judge, WRIGHT, Circuit Judge, and GASCH,* District Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 Opinion concurring in part and dissenting in part filed by Chief Judge McGOWAN.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 This case, involving denial by the Federal Communications Commission (FCC or Commission) of a petition to deny license renewals to eight Los Angeles television stations,[1] presents difficult questions concerning the obligations of public and commercial broadcasters to attempt to meet the programming needs of persons with impaired hearing. The issues arise under two statutes: the Communications Act,[2] under which the Commission can renew a station's license only upon a finding that its programming has served the public interest, and Section 504 of the Rehabilitation Act of 1973,[3] which prohibits discrimination against "otherwise qualified" handicapped persons by recipients of federal financial assistance. Because public television stations are apparently bound by Section 504 of the Rehabilitation Act to provide service to "otherwise qualified" handicapped persons, we do not believe that the FCC could find the service of such stations to be adequate to justify renewal without at least inquiring specifically into their efforts to meet the programming needs of the hearing impaired. Accordingly, we hold that the challenge to the license renewal of public station KCET-TV must be remanded to the Commission for further proceedings.
 
 
 2
 We conclude, however, that Section 504 does not apply directly to commercial broadcasters. We therefore hold that the decision of the Commission concerning the seven commercial stations may be upheld, on the basis of both the record compiled below and the Commission's representations of substantial progress in extending the benefits of commercial television to the hearing impaired. In so doing, however, we recognize that the Commission's statutory obligation to pursue the public interest requires it to protect the interests of the hard of hearing in having meaningful access to commercial broadcasting. We also note that rulemaking might be a better, fairer, and more effective vehicle for considering how the broadcast industry is required to provide the enjoyment and educational benefits of television to persons with impaired hearing. Radio has been available to the general public for over half a century, as has television for over a quarter century. But millions of Americans have lived and died during that time without being able to enjoy radio and television simply because their hearing was impaired. It is time for the Commission to act realistically to require, in the public interest, that the benefits of television be made available to the hard of hearing now.
 
 I. BACKGROUND
 A. Statutory Context
 
 3
 This case, in which appellants challenge an FCC order denying a petition to deny license renewals to eight Los Angeles television stations,[4] arises against a complex background of federal statutes and administrative action. The Communications Act of 1934 charges the Federal Communications Commission with granting broadcast licenses and license renewals.[5] The Commission does so pursuant to a general mandate to protect and advance "the public interest, convenience, and necessity."[6] Although this mandate is general, the Commission has in fact interpreted it through the issuance of a number of regulations and guidelines. These Commission guidelines typically govern decisions about whether to renew broadcast licenses in cases where there is no announced competitor for a license held by the applicant for renewal.[7] Although the statute provides that "(a)ny party in interest may file with the Commission a petition to deny any application,"[8] the Commission need generally hold no hearings unless the petition raises a "substantial and material question of fact"[9] concerning the incumbent licensee's satisfaction of pertinent Commission standards. Where no question is raised concerning the station's compliance with Commission guidelines, renewal is generally granted without public hearing.
 
 
 4
 Both the courts and the FCC have construed the "public interest" standard for license awards to include a requirement that broadcasters endeavor to discover and to meet the programming needs of all significant groups within their areas of service.[10] The Commission publishes a list of specific groups whose needs must be "ascertained."[11] At least since 1970 it has urged licensees to make efforts to serve the hearing impaired,[12] a group estimated to include at least 13 million people, nationwide.[13] But the Commission has declined to include the hearing impaired among the groups whose needs must specifically be consulted.[14] Nor has it ever promulgated guidelines requiring entertainment programming for the hard of hearing. The Commission has, however, insisted that emergency broadcasts must be made accessible to the deaf,[15] and, whenever individual broadcasters have sought Commission approval for innovative service to the hearing impaired, the Commission has given its approval.[16] For example, the Commission in 1976 adopted rules to permit "closed captioning" for visual display of aural material accompanying television programs.[17] Pursuant to this grant of permission, the Public Broadcasting Service (PBS) and two of the commercial networks began in March 1980 to provide a total of up to 20 hours a week of programming captioned by the National Captioning Institute.[18] The FCC has also emphasized in its public pronouncements that "licensees can and will be responsive to the needs of their (hearing impaired) viewers, but it is still the responsibility of each licensee to determine how it can most effectively meet those needs."[19]
 
 
 5
 Although it has recognized that Section 504 of the Rehabilitation Act of 1973 may impose a statutory obligation on public television stations to accommodate at least some of their programming to the needs of the hearing impaired,[20] the FCC has thus far declined to take specific steps to enforce the Act.[21] The Department of Education has been officially designated as the agency to develop guidelines clarifying the specific obligations imposed on public broadcasters by Section 504.[22] The FCC has indicated that if any broadcaster should be found by another agency of government to be in violation of Section 504, it would "consider the effect of that violation upon the licensee's qualifications."[23] But because it is not the agency responsible for enforcement of the Rehabilitation Act, the FCC has stated that it will not attempt to hold broadcasters to any obligations thereunder, at least until the responsible agency has spoken.[24]
 
 B. Factual Background
 
 6
 Sue Gottfried is a hearing impaired member of the Los Angeles community. On October 28, 1977, on behalf of herself and others similarly situated, Mrs. Gottfried filed petitions to deny the license renewal applications of eight Los Angeles television stations.[25] In her petitions pertaining to the seven commercial licensees Mrs. Gottfried alleged generally that the stations had failed to ascertain or to meet the needs of the hearing impaired. She further argued that the stations, as recipients of valuable federal licenses, had failed to satisfy obligations imposed on them by Section 504 of the Rehabilitation Act of 1973. Regarding the public station KCET-TV, Mrs. Gottfried repeated her general claims and arguments, but she also added the specific charge that the station had shown indifference to the needs of the deaf by failing to broadcast, through most of its license term, a captioned version of the ABC Evening News that was made available to it by the Public Broadcasting Service.[26]
 
 
 7
 On September 8, 1978 the FCC denied Mrs. Gottfried's petitions to deny license renewals to the eight stations.[27] The petitions, the Commission said, had "failed to allege specific facts which raised any substantial or material question as to whether a grant of the renewal applications before us would serve the public interest, convenience, and necessity."[28] The FCC based this conclusion on the failure of the petitions to allege violations of any specific Commission standards or guidelines. The Commission noted that it had no requirement that stations develop demographic data related to the hearing impaired population of a service area, specifically ascertain the needs of the deaf, or utilize captioning or other techniques to make programming accessible to the hard of hearing.[29] The Commission also found that Section 504 of the Rehabilitation Act did not apply to the commercial licensees,[30] and it stated that the Department of Health, Education and Welfare (HEW) was the appropriate agency to consider whether the public station had violated the Act.[31] Although it said that it would give consideration to any adverse finding that HEW might reach, the Commission denied that a petitioner could raise a "substantial or material" renewal question merely by alleging noncompliance with the Rehabilitation Act or with the national policy expressed by that statute.
 
 
 8
 The appellants[32] responded to the Commission's order by filing a petition for reconsideration, in which they alleged, in elaborated form, essentially the same arguments they had made earlier.[33] They also filed supplemental pleadings in which they presented evidence that viewers were not averse to captioned programming and claimed that the Commission was obligated by HEW regulations and by Executive Order to implement Section 504 of the Rehabilitation Act.[34] Once again, the Commission dismissed the petition as failing to present a substantial or material question of fact requiring further hearings.[35] Because the petitioners had not effectively challenged the stations' compliance with stated FCC requirements, the Commission held that they had not raised a substantial claim that the licensees' service had failed to satisfy the statutory requirement of being in the public interest.
 
 
 9
 Pursuant to Section 402 of the Communications Act, 47 U.S.C. § 402 (1976), Mrs. Gottfried appealed the decision of the Commission to this court.
 
 II. ISSUES ON APPEAL
 
 10
 The issues presented in this appeal are complicated by the contested relationship between two statutes, the Communications Act and the Rehabilitation Act of 1973. The Rehabilitation Act does not directly impose any enforcement obligation on the FCC. But the Communications Act does require the FCC to make determinations about the requirements of the "public interest," and appellants argue that the "public interest" standard must be construed to require at least some consideration of the national policy expressed by the Rehabilitation Act and any legal obligations imposed on the stations by Section 504. We agree.
 
 
 11
 Because the parties have assumed that Section 504 of the Rehabilitation Act applies to public television stations,[36] we begin by considering the obligation of the FCC to weigh compliance with this standard in a challenge to renewal of a license such as that involved in this case. This discussion yields the conclusion that the case of the public station must be remanded to the Commission. We then consider the argument that Section 504 applies to the commercial stations, and conclude that it does not. Although the Commission may still be obliged to weigh the national policy of the Rehabilitation Act within the public interest standard, the commercial stations themselves have been assigned no direct statutory obligations to the hearing impaired. We therefore determine that the Commission has a range of discretion in assessing what commercial stations must do in the public interest, and in consideration of both its expertise and its efforts in the area, we defer to its judgment at this time. We repeat, however, that in our view television, both public and commercial, should be made available to persons with impaired hearing now.
 
 III. PUBLIC STATIONS
 
 12
 Section 504 of the Rehabilitation Act of 1973 provides:
 
 
 13
 No otherwise qualified handicapped individual in the United States * * * shall, solely by reason of his handicap, be excluded from * * * participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. ([37]
 
 
 14
 In this case appellants urge that public television station KCET-TV is a recipient of federal financial assistance subject to the statute. This claim rests on two bases. First, appellants argue that a broadcast license is itself a valuable commodity constituting "financial assistance" as that term is used under the Rehabilitation Act.[38] Second, appellants argue that KCET-TV, as a "public" or noncommercial educational broadcasting station, is subsidized by congressional appropriations channeled, among other sources, through the National Telecommunications and Information Administration of the Department of Commerce and the Corporation for Public Broadcasting.[39]
 
 
 15
 In its brief in this court the FCC does not dispute the applicability of Section 504 to public station KCET-TV. At the time it was the agency responsible for interpretation of the Rehabilitation Act and thus at a time when its construction would have been due "substantial deference" from a reviewing court[40] the Department of Health, Education and Welfare determined that Section 504 applies to public broadcasting stations.[41] The Department of Education, which has now assumed responsibility for developing guidelines applicable to public broadcasters, has apparently accepted this conclusion,[42] and the FCC has indicated a willingness to defer to its judgment.[43]
 
 
 16
 The case of KCET-TV also exhibits incidences of more direct and traditional "Federal financial assistance." During 1977, the year in which KCET-TV's petition for license renewal was challenged, federal agencies combined to provide the station with $2,298,160 an amount representing roughly 17 percent of its revenues for the year in restricted program grants.[44] The contributing agencies included the National Institute for Education, which granted $1,814,090; the National Endowment for the Arts, $461,872; the National Endowment for the Humanities, $18,243; and the United States Information Agency, $3,955. We therefore conclude that Section 504 imposed legal obligations on station KCET-TV during the term of its license preceding the renewal challenge, and we assume that it continues to do so.
 
 
 17
 There remain, however, important issues concerning the duty of the FCC to define the station's responsibilities under the Rehabilitation Act and to enforce the Act's policies in license renewal proceedings. The FCC is not the agency primarily responsible for enforcing the Rehabilitation Act. Nonetheless, appellants argue that the Act's Section 504 reflects a partial congressional definition of the FCC's obligation to serve "the public interest" in effect, a specification that the FCC must consider compliance with Section 504's nondiscrimination requirement in determining whether a public broadcaster has satisfied the public interest standard.[45] Second, appellants argue that the FCC is bound to take immediate action to implement Section 504, at a minimum by bringing its policies to bear in renewal proceedings such as this.[46] The FCC, noting that no guidelines have yet been issued by the Department of Education, takes a different view. The Commission asserts that it would be unfair to penalize a station in a license renewal proceeding for noncompliance with a statute for which interpretive guidelines were not in existence during the term of the license.[47]
 
 
 18
 Under the special circumstances presented by this case, we agree with appellants that the FCC is obligated to take account of a public broadcaster's legal duties under Section 504 in making its public interest determinations. Moreover, given the variety of procedural options pursuant to which the FCC could avoid unfair harshness to the broadcaster, we cannot accept that the public television stations need to be regarded by the Commission as free from any enforceable obligations under Section 504 until interpretive guidelines are issued.
 
 
 19
 A. Section 504 and the Public Interest Standard
 
 
 20
 The FCC is directed to renew broadcast licenses only if it finds that renewal would serve the "public interest, convenience, and necessity." 47 U.S.C. § 309(a) (1976). In construing this standard we must of course accord substantial deference to the Commission's judgments. As the Supreme Court has recently observed, " 'the weighing of policies under the "public interest" standard is a task that Congress has delegated to the Commission in the first instance.' " FCC v. WNCN Listeners Guild, --- U.S. ----, ----, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981), quoting FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 810, 98 S.Ct. 2096, 2119, 56 L.Ed.2d 697 (1978). Yet there remains, under the Communications Act, an inescapable judicial role. Although the "public interest" standard requires judgments of policy, see FCC v. WNCN Listeners Guild, supra, --- U.S. at ----, 101 S.Ct. at 1275, it also contains an irreducible element of law, see National Broadcasting Co. v. United States, 319 U.S. 190, 224-226, 63 S.Ct. 997, 1013, 87 L.Ed. 1344 (1943), which makes judicial review both necessary and possible. Cf. NAACP v. FPC, 425 U.S. 662, 669, 96 S.Ct. 1806, 1811, 48 L.Ed.2d 284 (1976) ("(T)he words 'public interest' in a regulatory statute * * * take meaning from the purposes of the regulatory legislation."). It is the function of the judiciary to resolve disputed questions of law. See Internat'l Brhd of Teamsters v. Daniel, 439 U.S. 551, 566 & n.20, 99 S.Ct. 790, 800 & n.20, 58 L.Ed.2d 808 (1979).
 
 
 21
 In their brief in this court appellants argue that the FCC's "public interest" mandate must be construed to incorporate the national policy of nondiscrimination against the handicapped minority, at least insofar as that policy imposes specific legal obligations under Section 504 of the Rehabilitation Act of 1973. We agree.
 
 
 22
 We begin with the settled proposition that a federal agency, in construing the requirements of the "public interest" under its governing statute, must at least give weight to federal laws and public policies addressed to similar purposes. See, e. g., McLean Trucking Co. v. United States, 321 U.S. 67, 79-80, 64 S.Ct. 370, 376, 88 L.Ed. 544 (1944) (Interstate Commerce Commission obliged to weigh policies implicit in Sherman Act); Northern Natural Gas Co. v. FPC, 399 F.2d 953, 961 (D.C.Cir.1968) (Federal Power Commission, operating under public interest mandate, is "obliged to make findings related to the pertinent antitrust policies, draw conclusions from the findings, and weigh these conclusions along with other important public interest considerations"); City of Pittsburgh v. FPC, 237 F.2d 741, 754 (D.C.Cir.1956) (FPC obligation to consider antitrust factors not alleviated by fact that antitrust enforcement generally committed to Attorney General); Johnston Broadcasting Co. v. FCC, 175 F.2d 351, 357 (D.C.Cir.1949); see also FMC v. Aktiebolaget Svenska Amerika Linien, 390 U.S. 238, 244, 88 S.Ct. 1005, 1009, 19 L.Ed.2d 1071 (1968) (antitrust laws are tool by which regulatory agency gives "understandable content to the broad statutory concept of the 'public interest' "); National Broadcasting Co. v. United States, supra, 319 U.S. at 222-224, 63 S.Ct. at 1011. It makes no difference in such cases that Congress may have vested primary responsibility for enforcement of a statutory policy in another agency. As the Supreme Court has made clear, the grant of enforcement power to one organ of government does not free others to ignore national laws and policies until such time as violations have been proved in the courts. See, e. g., McLean Trucking Co. v. United States, supra, 321 U.S. at 79-80, 64 S.Ct. at 376; National Broadcasting Co. v. United States, supra, 319 U.S. at 222-224, 63 S.Ct. at 1011.
 
 
 23
 By its passage of the Rehabilitation Act of 1973 Congress placed public stations under a legal obligation to consider and attempt to serve the interests of the nation's hearing impaired minority. Surely the policy of this statute falls well within the broad purposes of the Communications Act. As the Supreme Court has recognized, the "public interest" standard established by the Communications Act imposes on the FCC an affirmative "obligation * * * to ensure that its licensees' programming fairly reflects the tastes * * * of minority groups." NAACP v. FPC, supra, 425 U.S. at 670 n.7, 96 S.Ct. at 1812 n.7.
 
 
 24
 Following Congress' decision that recipients of federal assistance must extend their programs to otherwise qualified members of handicapped minorities, settled legal principles compel the conclusion that the FCC must, at a minimum, weigh this congressional policy in making "public interest" determinations. It is unreasonable to believe that a public station could give service cognizable as being "in the public interest" without at least making efforts to satisfy its statutory obligations.[48]
 
 
 25
 In holding as we do, we do little more than recall the FCC to a position it has itself asserted in the past. The Commission has frequently recognized its obligation under the public interest standard to protect the interests of minority groups previously excluded from full access to broadcast programming. See, e. g., Nat'l Organization for Women, NYC Chapter v. FCC, 555 F.2d 1002, 1017 (D.C.Cir.1977) (Commission considers "the employment practices of its licensees to the extent those practices affect the obligation of the licensee to provide programming that 'fairly reflects the tastes and viewpoints of minority groups' and to the extent those practices raise questions about the character qualifications of the licensee") (emphasis in original; footnotes omitted); Nondiscrimination in the Employment Policies and Practices of Broadcast Licensees, 60 FCC2d 222 (1976); Nondiscrimination in Employment Practices of Broadcast Licensees, 13 FCC2d 766 (1968). Although the Equal Employment Opportunity Commission was given primary responsibility for enforcement of the discrimination prohibitions of the 1964 Civil Rights Act, the FCC recognized its independent responsibility, pursuant to the public interest standard, to carry out the Act's policy. Its authority to do so has been recognized by the courts. See, e. g., NAACP v. FPC, supra, 425 U.S. at 670 n.7, 96 S.Ct. at 1812 n.7; Nat'l Organization for Women, NYC Chapter v. FCC, supra, 555 F.2d at 1015-1020. And where the Commission has lagged in accepting its responsibility, this court has not hesitated to direct it to do so. See, e. g., Black Broadcasting Coalition of Richmond v. FCC, 556 F.2d 59 (D.C.Cir.1977) (per curiam ); Office of Communication of United Church of Christ v. FCC, 359 F.2d 994 (D.C.Cir.1966). We do not shirk our duty in the present case.
 
 B. Required Procedures
 
 26
 In their brief in this court appellants have asked us to remand the license renewal application of public station KCET-TV for a public hearing and other appropriate proceedings by the FCC.[49] We regard this as the proper disposition.
 
 
 27
 The FCC has objected that KCET-TV complied with all existing Commission rules, and that there is thus "no substantial and material question of fact" to be determined before final action on the application.[50] But, as this court has held before, "Under Section 309(e) the Commission must set a renewal application for hearing where 'a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding' that the public interest, convenience, and necessity will be served by the license renewal." Office of Communication of United Church of Christ v. FCC, supra, 359 F.2d at 1007 (emphasis in opinion of Burger, J.; citation omitted).
 
 
 28
 Finding that Congress must be understood to have prescribed that the "public interest" encompasses at least the legal interests of the nation's hearing impaired minority, we do not believe that a Commission decision in which this factor has not been weighed can escape condemnation as "arbitrary, capricious, (or) an abuse of discretion."[51] As the Supreme Court held in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1972), satisfaction of this standard requires, at a minimum, "consideration of all relevant factors."
 
 
 29
 The task of weighing the interests of the hearing impaired is not an easy one, and we do not presume to intrude into the Commission's range of discretion in this difficult area. It is appropriate, however, for us to respond to some of the concerns that the Commission has raised on this appeal.
 
 
 30
 These concerns arise primarily from the ambiguity of the legislative policy expressed in Section 504. In construing this provision the responsible administrative agencies have concluded that Congress intended recipients of federal funds to make "reasonable accommodations" to provide service to handicapped persons, see 45 C.F.R. § 84.12 (1977) (HEW guidelines), current version 34 C.F.R. § 104.12 (1980) (Department of Education guidelines), and the courts have generally accepted this construction, see, e. g., United Handicapped Federation v. Andre, 558 F.2d 413 (8th Cir. 1977) (cause remanded to District Court for application of guidelines); Lloyd v. Regional Transportation Authority, 548 F.2d 1277 (7th Cir. 1977) (same). But, as the Supreme Court acknowledged in Southeastern Community College v. Davis, 442 U.S. 397, 412, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1979), the line between lawful refusal to extend affirmative action and illegal discrimination will not always be clear.
 
 
 31
 Emphasizing the difficulty of line-drawing in this area, the Commission pleads that it has no choice but to stay its hand. The Department of Education is currently engaged in preparation of interpretive guidelines construing the obligations that Section 504 imposes on public broadcasters.[52] Pending completion of those guidelines the FCC has said that it has no basis for assessing compliance with the statute, and that there would be nothing for it to consider in the public hearing requested by appellants. We do not agree.
 
 
 32
 In pursuing the public policy represented by Section 504 it is not the function of the FCC to adjudicate law violations, or, indeed, to regard itself as bound strictly by the specific dictates of the Rehabilitation Act or interpretive guidelines issued thereunder. See, e. g., California v. FPC, 369 U.S. 482, 490, 82 S.Ct. 901, 906, 8 L.Ed.2d 54 (1962); United States v. Radio Corp. of America, 358 U.S. 334, 350, 79 S.Ct. 457, 466, 3 L.Ed.2d 354 (1959). The Commission's responsibility is rather to effectuate the underlying national policy of providing federally assisted programs, including public television, to handicapped persons, such as the deaf, who are capable of benefitting from them.
 
 
 33
 In effectuating a policy that is currently framed in general terms only, the FCC must of course proceed with sensitivity to the situation of its licensees. In its review of KCET-TV's renewal application the Commission can appropriately consider the station's uncertainty about the precise requirements imposed on it by Section 504. It would indeed be unfair to insist on strict compliance with a standard developed after the fact, and we expect the FCC neither to develop nor to apply a fully formulated set of guidelines at this time. Nonetheless, it is clear to us that the absence of interpretive guidelines either now or during the station's license term could not justify a licensee's disregard of or indifference to the policies of the statute. Eight years after the passage of the Rehabilitation Act, we cannot accept that a public station still has no duty to make reasonable efforts to serve the handicapped, or that this duty cannot be enforced, in an agency proceeding, by an intended beneficiary of the statute. The Commission must therefore proceed immediately to inquire at least into the station's good faith, as manifest in its efforts to provide service in accord with the legislative policy goals of Section 504.
 
 
 34
 The Commission has also argued that it would be unfair for the issues at the heart of this case to be raised for the first time in a license renewal proceeding.[53] During the term of its license KCET-TV lacked clear standards defining the level of service required by Section 504. And in the absence of prior notice of the FCC's renewal policy, the Commission argues, it would be wrong to penalize a station for its shortcomings.
 
 
 35
 Our answer to this argument is implicit in what we have said before. Properly conducted, an FCC inquiry will impose no unreasonable burden on the station. Focusing primarily on good faith efforts to interpret and follow statutory policies, it should not enforce numerical criteria on a retroactive basis, but instead assess the station's willingness as measured against its capacity and its viewers' need to provide programming for the aurally handicapped.
 
 
 36
 As the Commission itself has asserted repeatedly, the predominant concern in a license renewal case may be "prospective, seeking to lead a licensee who has not possessed an adequate * * * program in the past to adopt policies ensuring" better performance in the future. Nat'l Organization for Women, NYC Chapter v. FCC, supra, 555 F.2d at 1017, quoting Nat'l Broadcasting Co., 58 FCC2d 419, 422 (1976); see Bilingual Bicultural Coalition of Mass Media, Inc. v. FCC, 595 F.2d 621, 628 & n. 24 (D.C.Cir.1978) (en banc). Consistent with that concern, in a case such as this the FCC may choose among a variety of dispositional alternatives, including short-term or conditional license renewal, as well as standard renewal or denial. We intimate because we hold no a priori preference among them. The ultimate decision is obviously not for us, but for the Commission,[54] with its special expertise concerning what can reasonably be expected of a public broadcaster within the context of current technology and current needs.
 
 
 37
 We recognize the indefiniteness with which our prescriptions are stated. The guidelines promised by the Department of Education will hopefully resolve many of the uncertainties confronting the stations, the Commission, and this court. But we reiterate our strong view that no guidelines are needed to identify the outlines of Congress' policy aims. The Commission like the stations must accept its duty now. There are many ways in which the policy of Section 504 of the Rehabilitation Act might be implemented. We hold only that it cannot be ignored.
 
 IV. COMMERCIAL STATIONS
 A. Section 504 and Federal Licenses
 
 38
 Appellants argue that the seven commercial stations involved in this case are also bound by Section 504 of the Rehabilitation Act, and that the FCC must therefore assess their compliance with the statute in considering applications for license renewal. We are unable to accept this argument in the terms advanced by appellants.
 
 
 39
 Section 504 directly imposes legal obligations only on recipients of "Federal financial assistance." Appellants correctly argue that a license to broadcast on the public airwaves is a commodity of great value.[55] But this does not resolve the question of congressional intent: Did Congress intend broadcast licenses to count as "financial assistance" within the meaning of Section 504? We are unable to conclude that it did.
 
 
 40
 The first reason arises from the statute's legislative heritage. Section 504 of the Rehabilitation Act was expressly modeled on Section 601 of Title VI of the Civil Rights Act of 1964.[56] And although the legislative history of Section 504 is sparse, we find ample evidence to conclude that Congress did not intend Title VI to reach the recipients of licenses from the FCC. This evidence includes congressional hearings and floor debates, in which various speakers interpreted the language as applying to "funds"[57] and "public moneys out of the Federal Treasury,"[58] and none apparently referred to federal licenses.[59] It also encompasses authoritative interpretations of the Civil Rights Act developed by the Attorney General both before and after the measure's passage. In anticipation of the congressional debate Congressman Celler asked the Justice Department to supply a list of federal programs and activities that would fall within the ambit of Title VI.[60] Duly prepared by the Deputy Attorney General, the list that appeared in the Congressional Record of June 10, 1964 included no reference to the FCC or to any other government program involving issuance of federal licenses.[61]
 
 
 41
 The Justice Department reiterated its interpretation after the Civil Rights Act had become law. Designated to develop interpreting regulations, the Department undertook to aid all affected agencies to formulate standards to implement Title VI. Yet it found no need for the issuance of regulations by the FCC.[62] The Justice Department's contemporaneous construction of the statutory term "Federal financial assistance" deserves substantial weight in this court, both because of the Department's close involvement in the drafting of the Civil Rights Act and because of its status as the agency responsible for "setting the (Act's) machinery in motion." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (citation omitted); E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 134-135, 97 S.Ct. 965, 978, 51 L.Ed.2d 204 (1977).
 
 
 42
 The agencies responsible for implementation of the Rehabilitation Act have followed the pattern of construction established under the Civil Rights Act. They too have regarded broadcast and other licenses as falling outside the statutory meaning of the term "Federal financial assistance." Neither HEW nor the Department of Education has thought it necessary to issue regulations applicable to commercial broadcasters.[63] And regulations issued by the Justice Department, which has recently been designated by Executive Order as the agency responsible for coordinating federal efforts to implement the Rehabilitation Act,[64] hold specifically that federal licensees are not bound by Section 504.[65] We note also that the Justice Department's interpretation accords with the FCC's construction of the Communications Act of 1934, under which licenses are not regarded as establishing property rights,[66] even though licensees do enjoy a limited renewal expectancy.[67]
 
 B. Public Interest Obligations
 
 43
 In denying appellants' claim that the FCC committed reversible error in failing to hold the seven commercial stations to specific obligations under Section 504, we are not unmindful that the FCC functions under a statutory obligation to make findings about the public interest, and that the Rehabilitation Act of 1973 may evidence a general national policy of considering the concerns of the deaf within the public interest rubric,[68] even where direct legal obligations are not imposed. Indeed, the FCC itself has sometimes suggested that it could not, consistent with its statutory mandate, ignore the wants and needs of minorities that national policies aim to protect.[69]
 
 
 44
 Because of the national policy of extending increased opportunities to the hearing impaired, we believe that some accommodations for the hard of hearing are required of commercial stations, under the general obligation of licensees to serve "the public interest, convenience, and necessity." But in the absence of specific statutory obligations directed at the commercial broadcasters,[70] we conclude that it would not be appropriate for us to delineate standards for the commercial stations or to require specific Commission procedures at this time.
 
 
 45
 In its brief in this court the Commission rehearses a series of efforts that it has encouraged and licensed from 1970 to the present.[71] It represents that it is moving forward in this area, and that it will continue to do so.[72] Recognizing that the Commission possesses special competence in weighing the factors of technological feasibility and economic viability that the concept of the public interest must embrace,[73] we defer today to its judgment. However, should the Commission fail to fulfill its obligations to the nation's hearing impaired minority, as we have indicated above,[74] judicial action might become appropriate at a later date.
 
 
 46
 In consideration of the Commission's representations of good faith and active concern, together with the record on which it based its decisions to renew the licenses of the seven commercial stations, we conclude that the action of the Commission with respect to the commercial broadcasters should be affirmed.
 
 V. CONCLUSION
 
 47
 For the reasons stated in this opinion, those portions of the Commission's order denying appellants' application to deny license renewal to public station KCET-TV are vacated and remanded to the Commission for further proceedings, and those portions of the order that concern the seven commercial stations are affirmed.
 
 
 48
 So ordered.
 
 
 49
 McGOWAN, Chief Judge, concurring in part and dissenting in part:
 
 
 50
 Petitions to deny renewal of license were filed in this case with respect to seven commercial television stations, and one non-commercial public educational licensee, in the Los Angeles area. The opinion for the court affirms the FCC's action in disallowing such petitions and renewing the licenses for the maximum permissible term in the case of the seven commercial licensees. I concur in that result, but in doing so I cannot be unaware of the vastly different burden imposed on the educational station by reason of the court's remand for hearing of the petition to deny directed to the renewal of its license.
 
 
 51
 The licensing period in question, by reference to which renewals were sought, is the same for each of the eight stations, namely, 1974 to 1977. The differing treatment by this court of the petitions to deny renewal beyond that period results because of the court's holding that the non-commercial station, KCET-TV, is receiving financial assistance from the federal government within the meaning of § 504 of the Rehabilitation Act of 1973, Pub.L.No.93-112, 87 Stat. 357, as amended, 29 U.S.C. § 794 (1976), whereas the seven commercial stations are not. Although the court expressly states that, by reason of the "public interest" standard contained in the Federal Communications Act, it does not regard the latter stations as home free from licensee renewal challenges in the future from representatives of the hearing-impaired, it expressly notes that rulemaking, as distinct from license renewal proceedings, "might be a better, fairer, and more effective vehicle for considering how the broadcast industry is required to provide the enjoyment and educational benefits of television to persons with impaired hearing."
 
 
 52
 I agree, but I would not, in disposing of this case, limit that principle to commercial stations. It also comports with the steps that have been taken to implement § 504 of the Rehabilitation Act. The Executive Branch of the Government, generally charged by the Constitution with enforcement of laws enacted by Congress, in 1976 assigned the responsibility for developing compliance standards for § 504 to the Department of Health, Education, and Welfare. The Department at length concluded that § 504 was applicable to non-commercial broadcast licensees, and it directed that its Office of Civil Rights develop compliance standards for such licensees. Under the Department of Education Reorganization Act, Pub.L.No.96-88, 93 Stat. 691 (1979), the newly-created Department of Education took over that responsibility; and the HEW study group involved in preparing compliance guidelines for public TV licensees was transferred to it.
 
 
 53
 On January 19, 1981, the Department of Education issued a Notice of Intent to Develop Regulations relating to the rights of access of the hearing-impaired to television programs, 46 Fed.Reg. 4954, inviting comments by March 5, 1981.[1] The Federal Communications Commission represents that, when such guidelines become available, it stands ready to take them fully into account in subsequent license renewal proceedings. And obviously the relevance of such guidelines in defining "the public interest" in the case of commercial license renewals will be very great indeed, even if they should be confined in terms to non-commercial stations.
 
 
 54
 Pending the issuance of such guidelines, I do not see why the benefits of their prospective operation should not extend to all licensees seeking renewal, commercial and non-commercial alike. Although it may be true, as we hold today, that the "financial assistance" from the Federal Government contemplated by the Congress in the Rehabilitation Act does not comprehend the existing free use of the publicly-owned airwaves by all licensees, form is favored over substance when commercial stations are, for this reason, spared the expense and uncertainty of renewal hearings, and a non-commercial station is not. Neither, on the record before us, had advance notice during their expired license terms of what was, and therefore could reasonably be, expected of them with respect to the wholly laudable, but technically complex, objective of providing access for the hearing-impaired.
 
 
 
 *
 Of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 There are seven commercial stations and licensees involved: KABC-TV, American Broadcasting Companies, Inc.; KCOP-TV, KCOP Television, Inc.; KHO-TV, RKO General, Inc.; KNBC-TV, National Broadcasting Co., Inc.; KNXT-TV, CBS, Inc.; KTLA-TV, Golden West Broadcasters; and KTTY-TV, Metromedia, Inc. The eighth station is a noncommercial or public station, KCET-TV, licensed to Community Television of Southern California
 
 
 [2]
 The Communications Act of 1934, ch. 652, 48 Stat. 1064, as amended, 47 U.S.C. § 151 et seq. (1976) (hereinafter cited to U.S. Code only)
 
 
 [3]
 Section 504 of the Rehabilitation Act of 1973, Pub.L.No.93-112, 87 Stat. 357, as amended, 29 U.S.C. § 794 (1976) (hereinafter cited to U.S. Code only). The provision is quoted in text at note 37 infra
 
 
 [4]
 See License Renewal Applications of Certain Television Stations Licensed For and Serving Los Angeles, California, 69 FCC2d 451 (1978) (Order) (reprinted at Joint Appendix (JA) 1), reconsid. denied, 72 FCC2d 273 (1979) (Reconsideration ) (JA 11)
 
 
 [5]
 See 47 U.S.C. §§ 307-309 (1976)
 
 
 [6]
 See 47 U.S.C. §§ 307(d), 309(a), 309(d) (1976)
 
 
 [7]
 It is well settled that the Commission, in order to obviate the need for repetitive hearings, may specify by rule the criteria that will govern its decisions. See United States v. Storer Broadcasting Co., 351 U.S. 192, 202-205, 76 S.Ct. 763, 770, 100 L.Ed. 1081 (1956); American Tel. & Tel. Co. v. FCC, 539 F.2d 767, 774-775 (D.C.Cir.1976). The Commission is not, of course, permitted to proceed pursuant to rules that are inconsistent with the underlying intent and purpose of the Communications Act. Citizens Communications Center v. FCC, 447 F.2d 1201, 1212-1214 (D.C.Cir.1971)
 
 
 [8]
 47 U.S.C. § 309(d) (1976)
 
 
 [9]
 See 47 U.S.C. §§ 309(d)(2), 309(e) (1976). Where the Commission specifies by rule the criteria that will govern its licensing decisions, see note 7 supra, questions falling outside the ambit of those rules will ordinarily not be regarded as substantial or material, unless the party opposed to the Commission's adopted policies asserts reasons sufficient to justify a change or waiver of the rules. United States v. Storer Broadcasting Co., supra note 7, 351 U.S. at 205, 76 S.Ct. at 771; American Tel. & Tel. Co. v. FCC, supra note 7, 539 F.2d at 774
 
 
 [10]
 See, e. g., Stone v. FCC, 466 F.2d 316, 327-328 (D.C.Cir.1972); Amendment of the Primer on Ascertainment of Community Problems by Commercial Broadcast Applicants, Permittees and Licensees, Docket No. 78-237 (April 4, 1980); Ascertainment of Community Problems by Broadcast Applicants, 53 FCC2d 3 (1975)
 
 
 [11]
 See Renewal Primer, 57 FCC2d 418, Appendix D, 447 (1976). The 19 "ascertainment" categories mandate inquiries into the service needs of (1) agriculture, (2) business, (3) charities, (4) civic, neighborhood, and fraternal organizations, (5) consumer service organizations, (6) culture, (7) education, (8) the environment, (9) government, (10) labor, (11) the military, (12) minority and ethnic groups, (13) organizations of and for the elderly, (14) organizations of and for women, (15) organizations of and for youth and students, (16) professions, (17) public safety, health, and welfare, (18) recreation, and (19) religion
 
 
 [12]
 See The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing, 26 FCC2d 917 (1970)
 
 
 [13]
 See Amendment of Subpart E, Part 73, of the Commission's Rules and Regulations, to Reserve Line 21 of the Vertical Blanking Interval of the Television Broadcast Signal for Captioning for the Deaf, Docket No. 20693, 63 FCC2d 378, 379 (1976)
 
 
 [14]
 The proposal that the handicapped should constitute a separate "ascertainment" category was specifically rejected in Amendment of the Primer on Ascertainment of Community Problems by Broadcast Renewal Applicants in Regard to the Community Leader Survey, Docket No. 78-237, FCC 80-134 (released April 4, 1980)
 
 
 [15]
 Amendment of Part 73 of the Rules to Establish Requirements for Captioning of Emergency Messages on Television, Docket No. 20659, 61 FCC2d 18 (1976), reconsid. denied, 62 FCC2d 565 (1977)
 
 
 [16]
 The most notable efforts in this area involve "closed captioning" a method of subtitling, similar to that used in foreign language films, but different in that it can only be seen on television sets equipped with decoding units. In 1972 the Commission authorized the Public Broadcasting System to initiate experiments with closed captioning, and in 1976 it promulgated rules to permit closed captioning by any broadcaster. Amendment of Subpart E, Part 73, of the Commission's Rules and Regulations, to Reserve Line 21 of the Vertical Blanking Interval of the Television Broadcast Signal for Captioning for the Deaf, supra note 13. The Commission has also instituted a clearinghouse program to provide information that would assist licensees in employing persons with various handicaps. The clearinghouse furnishes research data and reports concerning equipment availability and modification, and about various means to increase employment of and service to the handicapped. See Amendment of Broadcast Equal Employment Opportunity Rules and FCC Form 395, Docket No. 21474, FCC 80-62 (released March 6, 1980)
 
 
 [17]
 See note 16 supra
 
 
 [18]
 Brief for appellee at 5. The two commercial networks that are participating are the American Broadcasting Co. (ABC) and the National Broadcasting Co. (NBC). According to the National Captioning Institute, the Fall 1980 schedule of closed captioned programs included the ABC series Love Boat, Barney Miller, Eight is Enough, Friday Night Movie, and Three's Company, and the NBC series Disney's Wonderful World, Little House on the Prairie, Diff'rent Strokes, and Sunday Big Event. More than 15 PBS series are also captioned. See National Captioning Institute, Schedule of Closed-Captioned Programs Fall 1980 (1980). The third major commercial network, the Columbia Broadcasting System (CBS), is also involved in experimental efforts to provide the advantages of programming to the hard of hearing through a system known as "teletext." On July 29, 1980 CBS petitioned the FCC seeking a rulemaking leading to promulgation of rules that would allow television stations to undertake teletext transmission. See Amendment of Part 73, Subpart E of the Rules Governing Television Broadcast Stations to Authorize Teletext, RM-3727. "Teletext" is a generic name for systems that transmit letters, numbers, and other characters that can be made to appear on television screens equipped with special decoders. Because teletext could be used to provide information to the general public, CBS believes that it would ultimately be more useful to the hearing impaired, and also less expensive, than would a closed captioning system
 
 
 [19]
 Amendment of Subpart E, Part 73, of the Commission's Rules and Regulations, to Reserve Line 21 of the Vertical Blanking Interval of the Television Broadcast Signal for Captioning for the Deaf, supra note 13, 63 FCC2d at 389
 
 
 [20]
 See Order, supra note 4, 69 FCC2d at 459, JA 9
 
 
 [21]
 See id. at 458-459, JA 8-9; Reconsideration, supra note 4, 72 FCC2d at 276-280, JA 14-18
 
 
 [22]
 The responsibility was originally assigned to the Department of Health, Education and Welfare (HEW). See Executive Order 11914, 41 Fed.Reg. 17871 (April 28, 1976). Acting on the advice of HEW's Office of Civil Rights (OCR), Secretary Harris concluded in October 1979 that § 504 was applicable to public broadcasters receiving federal financial assistance, and she instructed OCR to develop compliance standards for public stations. No standards had yet been promulgated, however, when the Department of Education was established on May 4, 1980. Under the Department of Education Organization Act, Pub.L.No.96-88, 93 Stat. 691 (1979), the Department of Education assumed responsibility for administration of programs that provide financial assistance for production of programs shown on public television. The HEW study group that was involved in preparation of § 504 compliance guidelines for public television was also transferred to the Department of Education, and it remains there, located in the office of the Assistant Secretary for Civil Rights
 On January 19, 1981 the Department of Education issued a Notice of Intent to Develop Regulations concerning the rights of persons with impaired hearing to access to television programs. 46 Fed.Reg. 4954 (Jan. 19, 1981). It remains uncertain, however, when the rulemaking process will be completed. In Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California, d/b/a KCET-TV, Civil No. 78-4715-R (C.D.Cal.), the District Court ordered the Department to issue final regulations not later than February 17, 1981. But the District Court's order has been stayed by the Ninth Circuit, pending appeal. Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California, d/b/a KCET-TV, Nos. 80-5400 and 80-5445 (9th Cir. Dec. 19, 1980) (order staying order of lower court and ordering expedition of appeal).
 
 
 [23]
 Reconsideration, supra note 4, 72 FCC2d at 278, JA 16
 
 
 [24]
 Order, supra note 4, 69 FCC2d at 458-459, JA 8-9; Reconsideration, supra note 4, 72 FCC2d at 276-280, JA 14-18
 
 
 [25]
 See Order, supra note 4, 69 FCC2d at 451-452, JA 1-2; JA at 29
 
 
 [26]
 See JA at 24-28
 
 
 [27]
 Order, supra note 4, 69 FCC2d at 451, JA 1
 
 
 [28]
 Id. at 459, JA 9
 
 
 [29]
 Id. at 458, JA 8
 
 
 [30]
 Id. at 459, JA 9
 
 
 [31]
 Id. Responsibility for issuance of guidelines applying § 504 to public television has since been shifted to the Department of Education. See note 22 supra. The FCC apparently now considers that Education is the agency responsible for determining statutory violations
 
 
 [32]
 The Commission originally determined that Mrs. Gottfried was the only signer of the petitions to deny who had established standing before the Commission. See Order, supra note 4, 69 FCC2d at 453, JA 3. But the standing of the Greater Los Angeles Council on Deafness, Inc. (GLAD) was at least implicitly recognized by the Commission in Reconsideration, supra note 4, 72 FCC2d 273, JA 11, even though the Commission declined to reverse its earlier standing determination. See id. at 280, JA 18. GLAD is before this court as an appellant, together with Sue Gottfried, individually and on behalf of the hearing impaired population within the stations' viewing area
 
 
 [33]
 See Reconsideration, supra note 4, 72 FCC2d at 276, JA 14
 
 
 [34]
 Id. at 275-276, JA 13-14
 
 
 [35]
 See id. at 281, JA 19
 
 
 [36]
 In its brief in this court, see brief for appellee at 15-16 & n.9, the FCC states that it had determined to defer to the judgment of HEW on this question, and that "(i)n the case entitled Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California d/b/a KCET-TV, et al., Civil No. 78-4715-R (C.D.Cal.), HEW stated that it had determined that Section 504 is applicable to public television stations that receive federal financial assistance." As an intervenor in this court KCET-TV does not expressly concede the applicability of § 504, noting that Congress went to some lengths to assure that programming funded by the Corporation for Public Broadcasting is insulated from federal control and regulation. See brief for intervenor Community Television of Southern California at 15 n.7. Significantly, however, KCET-TV does not deny that it is a recipient of federal funds channeled to it through the Corporation for Public Broadcasting. Moreover, although it was generally eager to keep public broadcasting free from "governmental interference or control," Accuracy in Media, Inc. v. FCC, 521 F.2d 288, 293 (D.C.Cir.1975), Congress not only did not intend to free public broadcasters from all legal standards, see id. at 294-296, but actually created some programming standards applicable to public broadcasters only, see id. at 291 & n.7. We therefore reject any implied argument that Congress could not have intended federal funds channeled through the Corporation for Public Broadcasting to count as federal financial assistance merely because such a construction would subject recipients to a statutory requirement of nondiscrimination against the handicapped
 The administrative agencies responsible for implementing the Rehabilitation Act have held consistently that § 504 applies to public television broadcasters. See note 22 supra.
 
 
 [37]
 29 U.S.C. § 794 (1976)
 
 
 [38]
 This argument is based largely on the proposition that a license to broadcast on the public airwaves is a valuable commodity. See brief for appellants at 32-41. Although not explicitly disputing that broadcast licenses possess economic value, the FCC argues that Congress did not intend broadcast licenses to count as "Federal financial assistance" for purposes of applying the Rehabilitation Act. See brief for appellee at 15-30
 
 
 [39]
 Under the Educational Broadcasting Facilities Act, 76 Stat. 64 (1962), and the Public Broadcasting Act, 81 Stat. 365 (1967), 47 U.S.C. §§ 390-399 (1976 & Supp. III 1979), as amended by the Public Telecommunications Financing Act, 92 Stat. 2405 (1978), public or noncommercial educational broadcasting stations, such as KCET-TV, are subsidized by federal appropriations dispensed through the National Telecommunications and Information Administration of the Department of Commerce and/or the Corporation for Public Broadcasting. The Corporation, a nonprofit organization created by federal statute, receives funds directly from the federal treasury, subject to a number of statutory directives and prohibitions concerning how the funds may be spent. See 47 U.S.C. § 396 (1976 & Supp. III 1979)
 During its 1977 fiscal year, KCET-TV received $2,363,927 more than 18% of its total revenues from the Corporation for Public Broadcasting. See Private Defendants' Proposed Findings of Fact, Statements of Fact as to Which There Is No Genuine Issue, and Proposed Conclusions of Law (Sept. 28, 1979), Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California d/b/a KCET-TV, Civil No. 78-4715-R (C.D.Cal.). In the same year the station also got $495,229 from the Public Broadcasting Service, which in turn is largely funded by the Corporation for Public Broadcasting. KCET-TV's revenues for 1977 also included $2,298,160 in restricted program grants provided directly by various agencies of the federal government. See note 44 infra and accompanying text.
 
 
 [40]
 An administrative interpretation of a statute is due substantial weight from a reviewing court when it reflects "a contemporaneous construction of a statute by the (agency) charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) (citation omitted); see E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 134-135, 97 S.Ct. 965, 978, 51 L.Ed.2d 204 (1977); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [41]
 HEW in fact began to develop compliance guidelines for public broadcasters in October 1979, but it had not completed the task prior to its split into separate Departments of Health and Human Services and of Education in May 1980
 
 
 [42]
 The Department of Education has recently issued a Notice of Intent to Develop Regulations. See note 22 supra
 
 
 [43]
 See brief for appellee at 15-16 n.9; Order, supra note 4, 69 FCC2d at 459, JA 9 ("(I)n the event some adverse finding were made relative to Section 504, the Commission would take whatever action would be appropriate.")
 
 
 [44]
 See Private Defendants' Proposed Findings of Fact, Statements of Fact as to Which There Is No Genuine Issue, and Proposed Conclusions of Law (Sept. 28, 1979), Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California d/b/a KCET-TV, Civil No. 78-4715-R (C.D.Cal.)
 
 
 [45]
 See brief for appellants at 47-50
 
 
 [46]
 See id. at 51-55
 
 
 [47]
 Reconsideration, supra note 4, 72 FCC2d at 279, JA 17
 
 
 [48]
 In Accuracy in Media, Inc. v. FCC, 521 F.2d 288 (D.C.Cir.1975), this court held that the Commission lacks jurisdiction directly to enforce legal obligations imposed on the Corporation for Public Broadcasting by the Public Broadcasting Act of 1967, 81 Stat. 365 (1967), as amended, 47 U.S.C. §§ 390-399 (1976 & Supp. III 1979). Intervenor KCET-TV suggests that this holding rests on the principle that "the programming of noncommercial broadcast stations such as KCET is insulated from federal control and regulation," brief for intervenor Community Television of Southern California at 15 n.7, and that federal money channeled to noncommercial stations through the Corporation for Public Broadcasting should therefore not be construed as "Federal financial assistance" if such a construction would subject noncommercial broadcasters to federal legal controls. This claim rests on a confusion of arguments. Accuracy in Media held that the FCC could not directly, by order or otherwise, enforce the obligations imposed on the Corporation for Public Broadcasting by the Public Broadcasting Act. But the case did not hold that public stations were not recipients of federal financial assistance. It did not hold that they were not subject to legal obligations under other federal statutes. See 521 F.2d at 294-296. And, most important, it did not hold that the FCC should not indirectly enforce legal obligations, arising under federal statutes other than the Public Broadcasting Act, in licensing proceedings under the public interest standard. See id. at 295-296 & n.33. On the contrary, the court was careful to note that "(w)e find nothing * * * which limits established FCC authority * * * over local noncommercial licensees," id. at 295, and that "FCC regulation of the educational licensees was seen as the ultimate check on the public broadcasting system," id. at 295-296 n.33
 In recognizing the FCC's continuing and undiminished authority to assess compliance with the public interest standard, the Accuracy in Media court noted that, under a provision of the Public Broadcasting Act, 47 U.S.C. § 398 (1970), current version 47 U.S.C. § 398 (Supp. III 1979), no agency of government is authorized to "exercise any direction, supervision, or control" over public telecommunications. See 521 F.2d at 292 (quoting statute). But the court clearly stated that the "prohibition against governmental interference is expressly limited to (attempts to enforce) authorizations" contained in the Public Broadcasting Act itself, see 521 F.2d at 296, and that the FCC's obligation to uphold the public interest arises from a section of the Communications Act, 47 U.S.C. § 309 (1976), to which the prohibition did not apply.
 
 
 [49]
 See brief for appellants at 51-53. The FCC understands appellants to argue that the Commission is obligated to impose specific requirements of program captioning on all of its licensees. See brief for appellee at 38-39. Even if we believed appellants to be urging such a claim, we would need to reject it at this time, as prematurely interfering with the Commission's discretion to determine what accommodations to the deaf can reasonably be required of licensees under the public interest standard. See text accompanying notes 51-52 infra
 
 
 [50]
 Order, supra note 4, 69 FCC2d at 459, JA 9; brief for appellee at 30-40
 
 
 [51]
 5 U.S.C. § 706(2)(A) (1976)
 
 
 [52]
 It remains unclear, however, when the guidelines will be completed. See note 22 supra
 
 
 [53]
 See brief for appellee at 38-39
 
 
 [54]
 Appellants seem at some points in their brief to suggest that there can be no discretion in this matter, because the First Amendment protects the right of all segments of society to have access to programming over the public airwaves. See brief for appellants at 55-57. From this premise they appear to deduce a right to have broadcast programming captioned for the hearing impaired. Even if the First Amendment entitles the hearing impaired to have access to some minimum of programming over the airwaves, however, we could not accept that it requires all stations to make their programming accessible to all deaf persons all of the time. Cf. Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, 412 U.S. 94, 111, 93 S.Ct. 2080, 2091, 36 L.Ed.2d 772 (1973) (frequency scarcity makes it infeasible for all persons wishing to speak to have access to the air). In demanding fair access to the public airwaves for the hearing impaired, the First Amendment, in our view, sweeps no more broadly than the public interest standard of the Communications Act, under which we are unprepared to demand a specific, substantive interpretation from the Commission at this time
 Intervenors in this court have also lodged a First Amendment argument on behalf of the licensees: the argument that any captioning requirement the FCC might impose would violate protected rights of the broadcasters by regulating the "content" of their programming. See joint brief for intervenors American Broadcasting Companies, Inc.; Golden West Broadcasters; KCOP Television, Inc.; Metromedia, Inc.; National Broadcasting Co.; and RKO General, Inc. at 47-51. We find this argument to be without merit. A captioning requirement would not significantly interfere with program content. And in cases of more limited regulations such as those likely to come in issue it is well established that the Commission may constitutionally condition licenses on a station's provision of programming in the public interest. See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 390-392, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969); Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 226-227, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943).
 
 
 [55]
 Appellants cite an article, Levin, Economic Effects of Broadcast Licensing, 72 J.Pol.Econ. 151 (1964), in which it was estimated, as long ago as 1964, that the average value of a VHF license exceeded $1,500,000. See brief for appellants at 33-34. That figure was based on calculations of the difference between the sale price of stations actually sold and the replacement cost of the stations' material facilities. Whatever the actual figure, there can be no doubt that the broadcast licenses contested in this case possess great value. In the Los Angeles market, which comprises approximately 10 million people, the FCC grants only 13 commercial licenses to television broadcasters. And Los Angeles is the most profitable market in the country. Broadcasting Magazine, July 30, 1979, at 46-47. Cf. Sangamon Valley Television Corp. v. United States, 269 F.2d 221, 224 (D.C.Cir.1959) (broadcast license constitutes "valuable privilege"); Columbia Broadcasting System, Inc. v. Democratic Nat'l Committee, supra note 54, 412 U.S. at 174 n.5, 93 S.Ct. at 2122 n.5 (Brennan, J., dissenting) (free license is functional equivalent to "Government subsidization of broadcasters")
 
 
 [56]
 See S.Rep.No.93-1297, 93d Cong., 2d Sess., reprinted at (1974) U.S.Code Cong. & Ad.News 6373, 6390 ("Section 504 was patterned after, and is almost identical to, the anti-discrimination language of section 601 of the Civil Rights Act of 1964"); Lloyd v. Regional Transportation Authority, 548 F.2d 1277, 1280 & n.9 (7th Cir. 1977); 119 Cong.Rec. S6144-S6145 (daily ed. March 1, 1973) (remarks of Sen. Humphrey, indicating that § 504 represented substitute for amendments to Title VI to protect the handicapped). Congress reiterated its intent in 1978 when it adopted the Rehabilitation, Comprehensive Services and Development Disabilities Amendments, Pub.L.No.95-602. Section 120 of the Amendments, § 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794a(a)(2) (Supp. III 1979), points explicitly to Title VI as a model for § 504:
 The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section (504) of this (Act).
 
 
 [57]
 See, e. g., Civil Rights: Hearings before the House Judiciary Committee, 88th Cong., 1st Sess. 2731 (1963) (statement of Attorney General Robert F. Kennedy) ("It is going to be every program of the Federal government where Federal funds are expended.")
 
 
 [58]
 See, e. g., 110 Cong.Rec. S6430 (daily ed. March 26, 1964) (transcript of televised remarks of Sen. Humphrey) ("What it merely says is that public moneys out of the Federal Treasury will not be used to promote discrimination * * *.")
 
 
 [59]
 Not even opponents of the 1964 Civil Rights Act, who frequently criticized the measure on account of what they considered its excessively broad sweep, see, e. g., Minority Report Upon Proposed Civil Rights Act of 1963, Committee on Judiciary Substitute for H.R. 7152, reprinted at (1964) U.S.Code Cong. & Ad.News 2355, 2433 (bill "constitutes the greatest grasp for executive power conceived in the 20th century"), suggested that issuance of a federal license would subject licensees to Title VI. For example, Congressmen Poff and Cramer, who filed separate minority views, listed existing federal programs that "apparently would be embraced." See Separate Minority Views of Hon. Richard H. Poff and Hon. William Cramer, reprinted at (1964) U.S.Code Cong. & Ad.News 2471, 2471-2472. None of the programs contained on their list involved federal licensing. See id
 
 
 [60]
 See 110 Cong.Rec. H13380 (daily ed. June 10, 1964)
 
 
 [61]
 See id. at H13380-H13382
 
 
 [62]
 The Justice Department remains responsible for coordination and implementation of Title VI, see Executive Order 11764 (Jan. 24, 1974), 3A C.F.R. 124, and it has at no time issued, or asked the FCC to issue, regulations governing recipients of broadcast licenses
 
 
 [63]
 HEW was charged by Executive Order 11914, 41 Fed.Reg. 17871 (April 28, 1976), with the task of issuing general regulations for the guidance of all federal agencies providing financial assistance encompassed by § 504. It developed an expansive definition of financial assistance:
 (h) "Federal financial assistance" means any grant, loan, contract * * *, or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:
 (1) Funds;
 (2) Services of Federal personnel; or
 (3) Real and personal property or any interest in or use of such property, including:
 (i) Transfers or leases of such property for less than fair market value or for reduced consideration; and
 (ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.
 
 
 [45]
 C.F.R. §§ 84.3(h) & 85.3(e) (1979). Relying on the breadth of the HEW definition, appellants cite that agency's interpretation in support of their position. See brief for appellants at 28-31. Significantly, however, HEW never explicitly classified broadcast licenses as financial assistance, nor did that agency ever issue regulations specifically applicable to commercial broadcast licensees or ask the FCC to do so. The Department of Education, which has now assumed responsibility for issuing interpretive guidelines applicable to public broadcasters, has given no indication that it regards § 504 as applying to commercial licensees
 
 
 [64]
 See Executive Order 12250, 45 Fed.Reg. 72995 (Nov. 4, 1980)
 
 
 [65]
 See Nondiscrimination Based on Handicap in Federally Assisted Programs Implementation of Section 504 of the Rehabilitation Act of 1973 and Executive Order 11914, 45 Fed.Reg. 37620, 37632 (June 3, 1980) ("The term 'Federal financial assistance' * * * does not include licenses, for example, since licenses are not Federal assistance grants, contracts, loans, or cooperative agreements."). The Justice Department guidelines were intended to apply only to federally funded programs administered by the Department of Justice. Since their issuance, however, the Department has been designated as the agency primarily responsible for coordinating and implementing federal compliance with § 504. See Executive Order 12250, 45 Fed.Reg. 72995 (Nov. 4, 1980)
 
 
 [66]
 See Reconsideration, supra note 4, 72 FCC2d at 277, JA 15. The Commission bases its construction on the plain language of the Act, which states expressly that "no (broadcast) license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301 (1976). The Supreme Court has also held that Congress intended the Commission's grant of a license to create no property rights. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 331-332, 66 S.Ct. 148, 150, 90 L.Ed. 108 (1945); FCC v. Sanders Brothers Radio Station, 309 U.S. 470, 475, 60 S.Ct. 693, 697, 84 L.Ed. 869 (1940)
 
 
 [67]
 See, e. g., FCC v. Nat'l Citizens Committee for Broadcasting, 436 U.S. 775, 805, 98 S.Ct. 2096, 2117, 56 L.Ed.2d 697 (1978); Central Florida Enterprises, Inc. v. FCC, 598 F.2d 37, 61 (D.C.Cir.1978) (per curiam) (petition for rehearing)
 
 
 [68]
 Cf. text and notes at notes 48-52 supra; Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 13 FCC2d 766, 769 (1968):
 There is (a) National policy against discrimination in hiring. And here we note that this is a National policy. The 25-employee prescription in the Civil Rights Act does not limit that National policy, and specifically, "title VII was not intended to circumscribe the authority of Federal agencies other than the Equal Employment Opportunity Commission to regulate employment practices." (See letter of Assistant Attorney General Pollak, app. A, pp. 2-3.) Second, there is the consideration that broadcasting is an important mass media form which, because it makes use of the airwaves belonging to the public, must obtain a Federal license under a public interest standard and must operate in the public interest in order to obtain periodic renewals of that license. When these two considerations are taken together the National policy against discrimination and the nature of broadcasting we simply do not see how the Commission could make the public interest finding as to a broadcast applicant who is deliberately pursuing or preparing to pursue a policy of discrimination of violating the National policy. In this respect a mass media service to the public which is based entirely on a Federal license under a public interest standard the situation clearly parallels the Federal policy in contract awards. * * *
 
 
 [69]
 See The Use of Telecasts to Inform and Alert Viewers with Impaired Hearing, 26 FCC2d 917, 919 (1970) (expressing concern about needs of hearing impaired and noting that if stations do not voluntarily provide better service "it may be necessary to begin rule making looking toward the adoption of minimum requirements"); Petition for Rulemaking to Require Broadcast Licensees to Show Nondiscrimination in Their Employment Practices, 13 FCC2d 766, 769 (1968) (quoted in note 68 supra)
 
 
 [70]
 In its Notice of Intent to Develop Regulations, see note 22 supra, the Department of Education seems to hold open the possibility that at least some commercial stations may air programs that are produced with federal assistance, and that they may therefore be subject to statutory obligations under § 504 of the Rehabilitation Act. See 46 Fed.Reg. 4954, 4955 (Jan. 19, 1981). Because receipt of assistance of this kind has not been alleged as a basis for the existence of statutory obligations in this case, no such issue is before us. We hold only that broadcast licenses do not by themselves constitute "Federal financial assistance" within the meaning of § 504
 
 
 [71]
 Brief for appellee at 3-6. Some of the Commission's efforts are described at notes 12-19 supra and accompanying text
 
 
 [72]
 The Commission has expressed especially high hopes for the closed captioning program initiated in March 1980, pursuant to which PBS, NBC, and ABC are making available approximately 20 hours of "closed captioned" programming per week. See Reconsideration, supra note 4, 72 FCC2d at 281, JA 19:
 (W)e are satisfied that important advances are being made toward achieving the goals which petitioners espouse and which we share namely, the access of the aurally handicapped to the medium of television. We expect that the closed captioning project will be a success. However, if at a later date it is demonstrated that the project is not successful in making television programming more available and enjoyable to the hearing impaired, then it may be necessary for the Commission to determine if a rulemaking is warranted to ensure that the hearing impaired are not deprived of the benefits of television.
 (Footnote omitted.) The Commission made similar representations in oral argument before this court.
 
 
 [73]
 In the analogous case of establishing compliance guidelines for public stations under § 504, the Department of Education has asserted that at least the following factors must be taken into account: (1) costs of making broadcasting available to the hearing impaired; (2) alternative ways of distributing any costs incurred; (3) possible standards other than a requirement that all programming should be accessible to the hearing impaired; (4) attitudes of the general public toward open captioning and cameo signing; (5) the state of existing technology. See "Declaration of Cynthia G. Brown, Assistant Secretary for Civil Rights, Department of Education," accompanying Defendants' Motion to Modify Order of March 20, 1980, Greater Los Angeles Council on Deafness, Inc. v. Community Television of Southern California, d/b/a KCET-TV, Civil No. 78-4715-R (C.D.Cal.)
 
 
 [74]
 See discussion at pp. 301, 305-306, 314-315 supra
 
 
 [1]
 In addition to seeking denial of license renewal by the FCC, appellants have been simultaneously pursuing a suit in the United States District Court for the Central District of California seeking (1) to enjoin KCET-TV from broadcasting any program that is not open-captioned and (2) to cut off the distribution of federal funds to KCET-TV. Civil No. CV-78-4715-R (C.D.Cal.). The District Court after trial, on March 20, 1980, ordered the Department of Education to issue final regulations not later than November 17, 1980. The District Court on November 24, 1980 modified its order so as to enlarge the time until February 17, 1981. The Court of Appeals for the Ninth Circuit, on December 19, 1980, stayed the order as modified pending appeal. It also directed the appeal to be expedited, and calendared for hearing as soon as practicable after the appellee's brief is filed